[No. B176232. Second Dist., Div. Six. Feb. 27, 2006.]

EVA GEFFCKEN et al., Plaintiffs and Appellants, v.
SAMUEL D'ANDREA et al., Defendant and Respondent.

**COUNSEL**

Nicholas A. Weimer for Plaintiffs and Appellants.

John C. Lauritsen for Defendants and Respondents Samuel and Denise D'Andrea.

Horvitz & Levy, David S. Ettinger, Mary-Christine Sungalia; Proctor, McCarthy & Slaughter, William. M. Slaughter, Karen M. Harmeling, Gbriele Mezger-Lashly; McCarthy & Kroes, Patrick McCarthy and Gary S. Grubacich for Defendants and Respondents El Escorial Owners' Association and Good Management Company.

Wilson, Elser, Moskowitz, Edelman & Dicker, Lane E. Webb and Alan E. Greenberg for Defendant and Respondent Montecito Retirement Association.

Benton, Orr, Duval & Buckingham, Barton C. Merrill and Bruce Alan Finck for Defendants and Respondents R. J. Carroll & Sons Plumbing, Inc., and Commercial and Industrial Contructors, Inc.

## OPINION

**YEGAN, J.**—Eva Geffcken (Eva) and Alexander M. Geffcken (Alexander) appeal from the judgments entered against them and in favor of respondents.[1] Appellants claim that they were exposed to mold mycotoxins at their residence. Eva also claims that she was exposed to mold mycotoxins at her place of work. Appellants maintain that the exposure caused them to suffer from various ailments. Respondents allegedly were responsible for the management, maintenance, or construction of the properties.

Appellants contend that the trial court erroneously granted respondents' motions in limine (1) to exclude the testimony of one of appellants' two designated experts: Dr. Gary Ordog; (2) to exclude the environmental sampling data of appellants' other designated expert: Patrick Moffett, (3) to exclude the results of two medical tests: a mycotoxin antibody test and a blood serology test, and (4) to preclude them from alleging exposure to mycotoxins at the properties in question. Appellants also contend that, even if the trial court did not err in granting the motions in limine, it still erred in dismissing their causes of action for nuisance and constructive eviction. We affirm.

### Factual and Procedural Background

On June 20, 2001, appellants filed a complaint for damages. Appellants alleged that, while residing in unit 430 of the El Escorial Villas in Santa Barbara, they were unknowingly exposed to mold "circulating throughout and about" the property. Eva alleged that, while working as a caregiver at premises leased by Phillipa Weld in the Casa Dorinda development in Montecito (hereafter the Weld property), she was also exposed to mold. The

---

[1] Respondents include the following parties named as defendants in appellants' complaint: Samuel D'Andrea, Denise D'Andrea, El Escorial Homeowners Association, Good Management Company, and Montecito Retirement Association (doing business as Casa Dorinda). Respondents also include subcontractors named as cross-defendants in a cross-complaint. Two cross-defendants filed briefs: R.J. Carroll & Sons Plumbing, Inc., and Commercial and Industrial Constructors, Inc.

complaint consisted of four causes of action: nuisance, constructive eviction, breach of the warranty of habitability, and negligence.

The trial court conducted an Evidence Code section 402 hearing on respondents' motions in limine.[2] The hearing lasted several days. The following witnesses testified:[3]

*Dr. Gary Ordog*

In 1984 Dr. Ordog was certified as a Diplomate of the American Board of Medical Toxicology. Dr. Ordog's testimony at trial would concern "the general category" of mycotoxicosis, "which includes exposure and toxicity to mold." Mycotoxins are "poisons produced by molds" and are also "carcinogens." Exposure to mycotoxins had caused Eva to suffer from lung cancer, neurological problems, respiratory problems, immune deficiency, fibromyalgia, infections on her tongue, toenails, and skin, chronic fatigue, weakness, memory loss, and headaches. As to Alexander, Dr. Ordog opined that he also "has the general category called mycotoxicosis, or poisoning by mold or fungal toxins." Exposure to mycotoxins had caused him to suffer from chronic fatigue, immune dysfunction, neurological problems, respiratory problems, reactive airway disease, elevated liver enzymes, and chemical hepatitis of the liver.

In forming his opinion that exposure to mycotoxins had caused appellants' ailments, Dr. Ordog relied on their medical histories, on medical literature, and on environmental reports prepared by Patrick Moffett. The reports showed that mold spores had been found at the properties. According to Dr. Ordog, there were "high levels of pathogenic and toxigenic molds." However, no tests had been made to confirm the actual presence of mycotoxins.

Dr. Ordog also relied on the results of two medical tests. One test, performed by Immunosciences Lab., Inc. (Immunosciences), purportedly shows the presence of antibodies produced by exposure to mycotoxins. This is "an enzyme linked test that produces a chemical reaction when the antibody is present." Appellants scored in the upper 5 percent on the test, which indicates a substantial exposure to mycotoxins. In addition, Dr. Ordog relied on a blood serology test performed by IBT References Laboratories

---

[2] All statutory references are to the Evidence Code.

[3] We omit a summary of the testimony of Dr. Thompson Adams, who testified for respondents.

(IBT). This test purportedly shows the presence of antibodies produced by exposure to "the actual mold, the actual living organism," rather than to mycotoxins. The blood serology test results were positive for both appellants.

### Patrick Moffett

Patrick Moffett is an environmental and industrial hygienist, although he is not certified. In October 2000 he went to appellants' residence and to the Weld property to collect air samples, which he submitted to a laboratory for analysis. The analyses showed that the samples from both properties contained mold spores. He did not test for the presence of mycotoxins.

### Daniel Baxter

Daniel Baxter, an environmental scientist, testified for respondents concerning the test results of the air samples collected by Moffett. Baxter owned the laboratory that had analyzed the samples. He had been involved in the analysis of air samples from 5,000 or 6,000 homes for the presence of mold.

According to Baxter, Moffett had "failed to perform an adequate forensic investigation." In addition, Baxter opined that Moffett's "pervasive chain of custody errors and deficiencies invalidate the integrity of sampling results." Numbering on the samples had been inaccurately transposed.

Even if the sampling results were reliable, Baxter opined that nothing in Moffett's reports "could remotely associate mycotoxins" with appellants' residence or the Weld property. Moffett's air samples could have been tested for mycotoxins through gas chromatography and mass spectrometry, but these tests were not performed.

### Dr. Daniel Sudakin

Dr. Daniel Sudakin is board certified in medical toxicology and is a clinical assistant professor in the Department of Environmental and Molecular Toxicology at Oregon State University. He authored the chapter on mycotoxins and toxigenic fungi in the textbook Ellenhorn's Medical Toxicology (3d ed. 2003).

Dr. Sudakin testified that not all molds produce mycotoxins. "Certain species of molds are capable of producing mycotoxins." Mycotoxins are carried on mold spores. In order to be exposed to mycotoxins from inhalation, a person would have to breathe in mold spores.

Human beings "encounter mycotoxins each and every day." Mycotoxins may appear in agricultural products, including peanuts, corn, and cereals. Some mycotoxins, like penicillin, "have a beneficial effect and are used in pharmaceuticals." "It's a question of dose and response, if we are going to get to the issue of whether [mycotoxins] make[] humans ill." "Chromatographic methods" are the "technique that's used to measure mycotoxins in environmental samples."

Dr. Sudakin opined, "The assessment of mycotoxin antibodies in blood samples, as performed by [Immunosciences], is not generally accepted in the scientific community as a valid diagnostic technique to assess human exposure to mycotoxins." The test "is unreliable and has no scientific validity in the context of human exposure to mycotoxins."

Dr. Aristo Vojdani is the inventor of the Immunosciences test and the owner of the laboratory that performs the test. Dr. Sudakin recently attended Dr. Vojdani's deposition. "At the deposition," Dr. Sudakin declared, "Dr. Vojdani was not able to cite a single peer-reviewed scientific reference establishing that mycotoxins bind with human proteins, resulting in the production of antibodies in the blood." Dr. Sudakin also noted that Dr. Vojdani was "not aware of a [2001] publication in the peer-reviewed scientific literature that invalidates the mycotoxin antibody testing technique."

As to the blood serology test performed by IBT, Dr. Sudakin opined that the test has no value "in the context of mycotoxin exposure." Dr. Sudakin referred the court to a publication from the California Department of Health Services, dated November 2000. The publication notes that the IBT test purportedly measures serum antibodies to the fungus Stachybotrys chartarum (S. chartarum). IBT is the only laboratory in the United States that performs this test. The United States Food and Drug Administration (FDA) has not evaluated or approved the test. The publication concludes: "There are currently no validated biomarkers of exposure to specific indoor fungi or their toxins. S. chartarum serology tests have no clinical application at this time. They cannot be used to imply the presence of S. charatarum within a home or workplace environment, nor can they be used to prove patient exposure to this specific mold or its toxins." Dr. Sudakin testified that the Department of Health Services has not changed its position on this matter.

According to Dr. Sudakin, neither Moffett's environmental report nor any other documentation demonstrated the presence of mycotoxins at appellants' residence. The environmental testing had "been limited to the identification of fungi at the residence. This is a fundamental limitation, because the presence

of mold in a residential environment does not necessarily indicate that mycotoxins are present, or that any exposure to mycotoxins has occurred. . . . [N]o valid conclusion about mycotoxins as the cause of health effects can be derived from these limited environmental data unless an attempt is made to quantify exposure and dose."

### Dr. Adrian Casillas

Dr. Adrian Casillas is an assistant professor at the University of California Los Angeles Department of Medicine, Division of Clinical Immunology and Allergy. He is board certified in internal medicine as well as allergy and immunology. Dr. Casillas testified that Dr. Vojdani's mycotoxin antibody test "is not generally accepted in the medical or scientific communities and is not founded upon accepted scientifically reliable principles and procedures." "The mycotoxin antibody test does not follow accepted scientific principles as the quality control is not verified. Further, the clinical study of this test is unreliable as Dr. Vojdani himself had no knowledge of the health status of any subjects used in his study."

According to Dr. Casillas, neither Dr. Vojdani's test nor the IBT test has "any relevance in diagnosing mycotoxin-related illness." If a doctor suspected that a patient had been exposed to mycotoxins, the doctor would use a chromatographic technique to determine their presence.

### Dr. Aristo Vojdani

In his deposition, Dr. Vojdani testified that the mycotoxin antibody test is "new technology." He and his colleagues are the only persons "who have studied the viability of this test." The "only validation" of the test has been his own validation that he developed himself.

At the section 402 hearing, Dr. Vojdani testified that his laboratory is the only one in the United States that offers the mycotoxin antibody test. Other than his own articles, he was not "aware of any peer-reviewed study documenting the effectiveness of the test . . . ."

### Trial Court's Ruling

By granting respondents' motions in limine, the trial court excluded Dr. Ordog's testimony that exposure to mycotoxins had caused appellants' ailments. The court found that "he is not qualified to express any relevant opinions." In addition, it found that Dr. Ordog was unable to establish "that

any of the information that [he] gathered and put together or presented to us would have any evidentiary value or would pass the *Kelly-Frye* test." (See *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 54 App.D.C. 46 [293 F. 1013].)

The court also excluded the results of the mycotoxin antibody test performed by Immunosciences. The court found that "there is no evidence this test is generally accepted in the scientific community." Moreover, appellants were precluded: (1) from introducing evidence of the results of the blood serology test performed by IBT because the test did not satisfy *Kelly-Frye* requirements, and (2) "from alleging exposure to or the presence of mycotoxins" at appellants' residence and the Weld property. The court found that appellants "cannot establish the presence of mycotoxins at the subject properties based on competent expert testimony."

Pursuant to section 352, the court excluded Moffett's environmental sampling data. The court explained: "Mr. Moffett's testimony lacked credibility and his work was sloppy to an alarming degree as evidenced by the transmutation of numbering on the samples. Further, even if the presence of mold spores is assumed, plaintiffs cannot present competent or generally accepted scientific evidence establishing the presence of mycotoxins from such spores. Mycotoxin antibody testing is not generally accepted in the scientific community. Therefore, plaintiffs cannot present competent or reliable evidence of a causal connection between the presence of mold spores and any adverse affect [*sic*] on living beings such as [appellants]."

After the trial court's rulings, appellants' counsel said that they were "submitting the entirety of all the issues for the Court to determine whether judgment should be granted" in favor of respondents. Counsel stated that, as a result of the rulings, "from the Court's point of view and our situation at trial, frankly there's nothing left. We agree that there's nothing really left here." The court ordered that judgment be entered in favor of respondents.

### Notice of Appeal

Commercial and Industrial Constructors, Inc. (CICI) argues that, insofar as the appeal concerns itself, the appeal must be dismissed because of a defect in the notice of appeal. Appellants did not sue CICI. They sued Investec Construction, Inc. (ICI), a general contractor, which cross-complained for indemnity against several subcontractors including CICI. In May 2004 ICI and two other defendants (Santa Barbara Villas, L.P., and Investec Equities, Inc.) signed a settlement agreement with appellants. By the agreement, ICI assigned to appellants all of its rights against the cross-defendants. The

agreement states that appellants may proceed on ICI's cross-complaint in appellants' name and that any amount recovered on the cross-complaint shall be payable to appellants.

On June 3, 2004, after granting the motions in limine, the trial court ordered that judgment be entered in favor of all remaining defendants and cross-defendants. On June 24, 2004, appellants filed a notice of appeal "from the judgment or all judgments entered in the [action] against them and entered for all defendants and cross-defendants on June 3, 2004, and/or before and after." On January 12, 2005, an amended judgment was filed ordering that ICI "shall take nothing from CICI" and that CICI "shall have judgment in its favor against [appellants] as assignee of the cross-complaint of [ICI]."

■ CICI contends that "the adverse judgment entered against ICI is not before [this] court" because the notice of appeal contains "no reference to an appeal of [appellants'] assigned rights which they obtained from ICI during trial." We disagree. "[N]otices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced." (*Luz v. Lopes* (1960) 55 Cal.2d 54, 59 [10 Cal.Rptr. 161, 358 P.2d 289].) Appellants' notice of appeal makes it clear that they are appealing from the judgments entered in favor of all defendants and cross-defendants, including CICI. CICI has failed to show that it was misled or prejudiced by the notice of appeal.

*The Trial Court Did Not Err In Granting the Motions in Limine*

Exclusion of Moffett's Environmental Sampling Data

Appellants argue that the trial court erroneously excluded Patrick Moffett's environmental sampling data pursuant to section 352. This section provides in relevant part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'On appeals challenging discretionary trial court rulings, it is *appellant's* burden to establish an abuse of discretion. [Citations.]' [Citation.]" (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 624 [98 Cal.Rptr.2d 388].) Appellants have failed to establish an abuse of discretion here.

■ Moffett's data had little, if any, probative value. Daniel Baxter, the owner of the laboratory that had analyzed the air samples collected by Moffett, opined that Moffett's "pervasive chain of custody errors and deficiencies invalidate the integrity of sampling results." Baxter testified that, at the Weld property, "[t]here are at least ten errors that are in that chain of custody that are pervasive from beginning to end." For appellants' residence, there are "over 20" chain of custody errors. Through the presentation of PowerPoint slides, Baxter explained in detail the chain of custody errors. Because sample numbering had been inaccurately transposed, "there's no direct way to match the [sample] locations with the reported results." Thus, "[t]here's actually no way to make sure that not only does one sample represent one particular location, but also whether that one sample actually came from [appellants' residence] or whether it came from [the Weld property]." Baxter concluded that the culture samples and the test results are inherently unreliable.

The trial court credited Baxter's testimony. It found that Moffett's "work was sloppy to an alarming degree as evidenced by the transmutation of numbering on the samples." The court stated: "You simply can't explain away a transmutation of numbering on your samples and just say that that's not important. It's critically important." Appellants have not referred us to any evidence in the record showing an adequate chain of custody.

In any event, the probative value of Moffett's data was minimal because at most it showed that mold spores, not mycotoxins, were present at appellants' residence and the Weld property. As the trial court noted, "even if the presence of mold spores is assumed, [appellants] cannot present competent or generally accepted scientific evidence establishing the presence of mycotoxins from such spores." Moffett's air samples could have been tested for mycotoxins through gas chromatography and mass spectrometry, but these tests were not performed. Daniel Baxter opined that nothing in Moffett's reports "could remotely associate mycotoxins" with appellants' residence or the Weld property. A publication by the Environmental Protection Agency, which Dr. Ordog considered to be "authoritative," states: "The presence of mold in a building does not necessarily mean that mycotoxins are present . . . ." Another publication by the American College of Occupational and Departmental Medicine states: "It does not necessarily follow from the mere presence of a toxigenic species [of mold] that mycotoxins are present." (Fns. omitted.)

The trial court could have reasonably concluded that the minimal probative value of Moffett's environmental sampling data was substantially outweighed by the probability that its admission would "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.

Code, § 352.) The issue was not whether mold spores had been present at appellants' residence and at the Weld property. The issue was whether appellants had been exposed to mycotoxins at these properties, and whether those mycotoxins had caused the various ailments from which they allegedly suffered. According to Dr. Sudakin, "no valid conclusion about mycotoxins as the cause of health effects can be derived from [Moffett's] limited environmental data unless an attempt is made to quantify exposure [to mycotoxins] and dose." But no evidence was presented that appellants had ever been exposed to mycotoxins, in any dose, at the properties in question.

Exclusion of the Immunosciences Mycotoxin Antibody Test
and the IBT Blood Serology Test

■ Appellants contend that the trial court erroneously applied the *Kelly/Frye* test to exclude the results of the Immunosciences mycotoxin antibody test and the IBT blood serology test. "[T]he *Kelly/Frye* test constitutes a judicially created rule relating to the admissibility of certain types of evidence . . . ." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 845 [16 Cal.Rptr.3d 420, 94 P.3d 551].) "[U]nder the *Kelly-Frye* rule the proponent of evidence derived from a new scientific methodology must satisfy *three* prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that ' "correct scientific procedures were used in the particular case." ' " (*People v. Roybal* (1998) 19 Cal.4th 481, 505 [79 Cal.Rptr.2d 487, 966 P.2d 521].) "On appeal, the 'general acceptance' finding under prong one of *Kelly* is ' "a mixed question of law and fact subject to limited de novo review." [Citation.] "[W]e review the trial court's determination with deference to any and all supportable findings of 'historical' fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance." [Citation.]' [Citation.]" (*People v. Hill* (2001) 89 Cal.App.4th 48, 57 [107 Cal.Rptr.2d 110].)

■ As a matter of law, appellants failed to show that the Immunosciences mycotoxin antibody test has gained general acceptance in the relevant scientific community. Immunosciences is the only laboratory in the United States that conducts the test. Dr. Vojdani, the inventor of the test and the owner of Immunosciences, admitted that he and his colleagues are the only persons who have studied the viability of the test. Dr. Vojdani testified that "the only validation" of the test has been his own validation that he developed himself. Because of his financial interest in promoting the test, Dr. Vojdani's testimony is suspect: "[I]n cases where the *sole* (or a *crucial*) witness has a significant financial or professional interest in promoting the new technique . . . , that witness's ability to speak for [the scientific

community] concerned has been questioned." (*People v. Reilly* (1987) 196 Cal.App.3d 1127, 1139 [242 Cal.Rptr. 496].) Doctors Sudakin and Casillas testified that the Immunosciences test is unreliable and is not generally accepted in the scientific community as a valid technique to determine human exposure to mycotoxins. According to Dr. Sudakin, a 2001 publication "in the peer-reviewed scientific literature . . . invalidates the mycotoxin antibody testing technique." In any event, appellants have failed to point to evidence in the record supporting the third *Kelly-Frye* prong: "that ' "correct scientific procedures were used in the particular case." ' " (*People v. Roybal, supra,* 19 Cal.4th at p. 505.)

As a matter of law, appellants also failed to show that the IBT blood serology test has gained general acceptance in the relevant scientific community as a valid diagnostic technique for assessing human exposure to toxigenic mold. IBT is the only laboratory in the United States that performs the test, which has not been evaluated or approved by the FDA. A publication from the California Department of Health Services concluded that IBT's blood serology test "cannot be used to imply the presence of *S. charatarum* within a home or workplace environment, nor can [it] be used to prove patient exposure to this specific mold or its toxins." The publication notes that "[t]here are currently no validated biomarkers of exposure to specific indoor fungi or their toxins." Dr. Sudakin opined that the IBT test has no value "in the context of mycotoxin exposure." Dr. Casillas opined that the test does not have "any relevance in diagnosing mycotoxin-related illness." Furthermore, as with the Immunosciences test, appellants have not directed us to any evidence in the record supporting the third *Kelly-Frye* prong.

Accordingly, the trial court did not err in excluding evidence derived from the Immunosciences mycotoxin antibody test and the IBT blood serology test.

### Preclusion from Alleging Exposure to Mycotoxins at Appellants' Residence and the Weld Property

We reject appellants' contention that the trial court erroneously precluded them from alleging exposure to mycotoxins at appellants' residence and the Weld property. The trial court did not err in excluding Moffett's environmental sampling data as well as the results of the Immunosciences mycotoxin antibody test and the IBT blood serology test. In view of these rulings and the absence of any testing for mycotoxins at the properties in question, there is no evidence that appellants were exposed to mycotoxins at these properties.

### Exclusion of Dr. Ordog's Testimony

Section 801 states: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶]

(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." "We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible. [Citations.]" (*In re Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564 [10 Cal.Rptr.3d 34].)

■ " 'The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed. [Citations.] Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value.' [Citation.]" (*In re Lockheed Litigation Cases, supra,* 115 Cal.App.4th at p. 563.)

"A trial court exercises discretion when ruling on the admissibility of expert testimony under Evidence Code section 801, subdivision (b). If the court excludes expert testimony on the ground that there is no reasonable basis for the opinion, we review the exclusion of evidence under the abuse of discretion standard. [Citations.]" (*In re Lockheed Litigation Cases, supra,* 115 Cal.App.4th at p. 564.)

Here the trial court excluded Dr. Ordog's testimony for two reasons. First, it found that "he is not qualified to express any relevant opinions." Second, it impliedly found that there was no reasonable basis for his opinion that the exposure to mycotoxins had caused appellants' ailments. The court stated that Dr. Ordog was unable to establish "that any of the information that [he] gathered and put together or presented to us would have any evidentiary value or would pass the Kelly-Frye test."

We need not consider whether Dr. Ordog qualified as an expert on the subject of adverse health effects caused by exposure to mycotoxins. Irrespective of whether he had the requisite qualifications, the trial court did not abuse its discretion in impliedly finding that there was no reasonable basis for his opinion that the exposure to mycotoxins had caused appellants' ailments. In view of the absence of any reliable evidence that appellants had been exposed to mycotoxins at the properties in question, Dr. Ordog's opinions were speculative and conjectural. As explained *ante*, Dr. Ordog could not have reasonably relied on Moffett's environmental data showing the presence of mold spores at the properties. Not only were Moffett's test results inherently unreliable, but the testing had been limited to the identification of

fungi. No one had tested for the presence of mycotoxins. Moreover, Dr. Ordog could not have reasonably relied on the Immunosciences mycotoxin antibody test or the IBT blood serology test because these scientific techniques failed to satisfy the *Kelly-Frye* requirements. Furthermore, as Dr. Ordog pointed out in his testimony, the IBT test purportedly shows the presence of antibodies produced by exposure to "the actual mold, the actual living organism," not to mycotoxins.[4]

### *Appellants Are Estopped from Contending That Judgment Was Erroneously Granted on the Nuisance and Constructive Eviction Causes of Action*

Appellants contend that the trial court erroneously ordered that judgment be entered in respondents' favor on the causes of action for nuisance and constructive eviction.[5] Appellants maintain that the rulings at the section 402 hearing were not dispositive of these causes of action.

After the trial court's rulings, appellants' counsel said that he was "submitting the entirety of all the issues for the Court to determine whether judgment should be granted" in favor of respondents. Counsel stated that, as a result of the rulings, "from the Court's point of view and our situation at trial, frankly there's nothing left. We agree that there's nothing really left here."

■ Counsel's statements constituted a representation that the rulings had left appellants with insufficient evidence to proceed to trial on any of the causes of action. Counsel, therefore, invited the court to enter judgment in respondents' favor on the causes of action for nuisance and constructive eviction. Because counsel invited the entry of judgment, appellants are estopped from contending that the trial court erred. "The 'doctrine of invited error' is an 'application of the estoppel principle': 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal. [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79].)

---

[4] Our holdings herein concerning the trial court's exclusion of evidence at the section 402 hearing are limited to the specific facts of this case. They do not constitute precedent for the exclusion of similar evidence under materially different factual scenarios. For example, under a materially different set of facts, our holdings would not preclude a trial court from ruling that the required *Kelly-Frye* foundation had been met for the admission of the Immunosciences mycotoxin antibody test and the IBT blood serology test.

[5] At appellants' request, the constructive eviction cause of action against El Escorial Homeowners Association and Good Mangement Company was dismissed on September 5, 2001. But this cause of action was still pending against Samuel and Denise D'Andrea.

*Disposition*

The judgment is affirmed. Respondents shall recover their costs on appeal.

Gilbert, P. J., and Coffee, J., concurred.

On March 28, 2006, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied June 14, 2006, S141843.