[No. B186000. Second Dist., Div. Four. May 11, 2009.]

DARCEE DEE, Plaintiff and Appellant, v.
PCS PROPERTY MANAGEMENT, INC., et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*This opinion is to be published with the exception of parts 2. through 5., of the Discussion.

**COUNSEL**

Law Offices of Belli & Stubblefield and Scott B. Whitenack for Plaintiff and Appellant.

Horvitz & Levy, David M. Axelrad, Mary-Christine Sungaila; Parker Stanbury and John D. Barrett, Jr., for Defendants and Respondents.

**OPINION**

MANELLA, J.—

## INTRODUCTION

"Mold is a fungus which is essentially everywhere. Almost every breath we take contains mold spores." (Comment, *Mold Is Gold: But, Will It Be the Next Asbestos?* (2003) 30 Pepperdine L.Rev. 529, 532, fns. omitted.) "Exposure to certain types of mold, known as toxic mold, allegedly may cause a severe reaction. 'Toxic mold refers to those molds capable of producing mycotoxins, which are organic compounds capable of initiating a toxic response in vertebrates.' " (*Ibid.*, fn. omitted.)

**(1)** A jury returned a defense verdict in Darcee Dee's (appellant's) lawsuit stemming from her exposure to mold in her apartment. On appeal, Dee challenges the trial court's exclusion of proposed expert testimony that her numerous ailments, ranging from an increased risk of cancer to fibromyalgia, were caused by her exposure to mold. In the published portion of this opinion, we conclude that because Dee's experts relied on unsupported assumptions and inadmissible blood and brain tests, the trial court did not abuse its discretion in concluding their opinions lacked foundation. In the unpublished portion of the opinion, we find Dee's remaining challenges are unsupported by legal argument and thus are forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Parties*

Darcee Dee lived in unit 307 at Mammoth Park Towers for approximately four and a half months from January 18, 2001, to June 1, 2001. 8611 Venice Blvd., Corp Inc. owned Mammoth Park Towers, and PCS Property Management, Inc. (PCS), managed the property and employed Karen Mackie Thaler. (Collectively, 8611 Venice Blvd., Corp Inc.; PCS; and Thaler are referred to as respondents.)

### 2. *Mold in Unit 307*

On May 14, 2001, and June 1, 2001, Patrick Michaels, on behalf of Scope Laboratories, tested unit 307 for mold and found stachybotrys, a type of mold

capable of producing mycotoxins. Stachybotrys growth does not necessarily show the existence of mycotoxins, and Michaels did not test for mycotoxins.[1] In addition to stachybotrys, the existence of aspergillus and penicillium, another type of mold, was noted but considered normal.

On June 5, 2001, Chuck McCabe, on behalf of Awarded Global Services, Inc., tested unit 307 for mold. McCabe found two spores of stachybotrys in the air and aspergillus and penicillium as well as caudisporum in the carpet. He concluded that there was "mold amplification occurring there [in unit 307] beyond what would exist in a typical situation . . . ."

McCabe conducted additional tests on June 14, 2001, two weeks after Dee had vacated the unit. The second test indicated that the aspergillus was yeast, a "ubiquitous" type of mold. One mycotoxin, specifically a gliotoxin, was found. This mycotoxin, however was excluded from McCabe's analysis because it was "an extremely min[o]r amount." McCabe indicated that "mycotoxin analysis of the carpet sample did not find any measurable amount of any of the tested compounds . . . ."

### 3. *Complaint*

Dee sued PCS; 8611 Venice Blvd., Corp Inc.; Thaler; and other defendants not parties to this appeal, alleging causes of action for fraud and concealment, negligence, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and unfair business practices. Dee amended the complaint to add a cause of action for intentional infliction of emotional distress, based on fear of cancer. She dismissed her cause of action for unfair business practices.

Dee alleged that each respondent owned, managed, operated, or maintained buildings or participated in the construction or repair of buildings located at Mammoth Park Towers. According to Dee, the negligent design and construction of Mammoth Park Towers allowed excessive condensation to form on

---

[1] Brian Daly, the technical director at Hygiene Technologies International, Incorporated, who conducted a fungal growth assessment in Dee's apartment, testified that stachybotrys growth does not necessarily demonstrate the presence of mycotoxins. According to Dee's expert, Dr. Gary J. Ordog, at the time Dee was at Mammoth Park Towers there was no commercially available method of measuring mycotoxins in the environment. Dee's proposed expert, Dr. Gunnar Heuser, acknowledged in his deposition that "mold[] do[es] not always produce toxins." Heuser stated, "all of us are exposed to mold at various times in our lives." No witness testified that stachybotrys growth or other mold growth necessarily shows the presence of mycotoxins.

pipes and drip into the building. She also alleged that respondents failed to investigate water intrusion or repair chronic water intrusion in unit 307 and failed to properly install and maintain the air conditioner. Dee claimed that respondents fraudulently concealed "species of toxigenic, allergenic and carcinogenic fungi that had colonized and sporulated in Unit # 307 . . ." and failed to inform her of stachybotrys when they discovered it on May 23, 2001. As a result, Dee was exposed to mold and suffered physical injury and emotional distress, including the fear of cancer. Dee further alleged that respondents created a "special risk of bodily harm to Plaintiff" because they did not move her prior to June 1, 2001, the date they opened the walls to test for mold.

### 4. *Motions In Limine*

■ Respondents filed or joined numerous motions in limine, attempting both to exclude results of tests conducted on Dee, based on *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*),[2] and to exclude Dee's proposed expert testimony on causation, based primarily on Evidence Code section 801 (further undesignated statutory references are to the Evid. Code). *Kelly* requires three prerequisites for admission of evidence obtained through a new scientific technique: (1) "proof that the technique is generally accepted as reliable in the relevant scientific community"; (2) "proof that the witness testifying about the technique and its application is a properly qualified expert on the subject"; and (3) "proof that the person performing the test in the particular case used correct scientific procedures." (*People v. Bolden* (2002) 29 Cal.4th 515, 544–545 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

There is no dispute that the court properly excluded evidence of a SPECT (single photon emission computed tomography) scan and of blood tests. According to respondents, SPECT "is a nuclear medicine study that uses small doses of radioisotopes to evaluate brain flow and activity patterns." Dee withdrew her objection to exclude the results of the SPECT scan.

The court ruled that blood tests performed by Immunoscience Laboratories, including an ELISA (enzyme-linked immunosorbent assay) test to analyze mycotoxin antibodies and an interleukin-2 test allegedly reflecting mycotoxicosis, were inadmissible. "[T]he only laboratory in the world that does this testing is Dr. [Aristo] Vojdani's. The work is not generally accepted in the

---

[2] Defendants referred to the test as *Kelly-Frye*, but it is now referred to as the *Kelly* test in reference to *Kelly*, *supra*, 17 Cal.3d 24. (*Roberti v. Andy's Termite & Pest Control, Inc.* (2003) 113 Cal.App.4th 893, 898, fn. 4 [6 Cal.Rptr.3d 827] (*Roberti*).)

relevant medical community as being capable of identifying exposure to mycotoxins." On appeal, Dee does not challenge the exclusion of the blood tests. She does, however, challenge the exclusion under section 801 of portions of the testimony of her proposed experts, Drs. Ordog, Heuser, and Juan Manuel Gutierrez, on causation.

### a. *Dr. Gary J. Ordog: Section 402 Hearing*

Gary J. Ordog, a physician, specialized in medical toxicology, emergency medicine, and forensic medicine. At a hearing to determine whether Ordog should be permitted to testify on the causation of Dee's ailments, Ordog testified that Dee was exposed to mold for the duration of her residence in unit 307 and that she had positive antibodies to stachybotrys. He relied upon the SPECT scan and the ELISA mycotoxin test. He also relied on a bibliography of references on mycotoxicosis, several articles (some of which he provided to the court), the Scope Laboratories' and McCabe's analyses of mold, and Proposition 65. Ordog "underst[ood]" that there were "low levels of mycotoxins found, including aflatoxin and satratoxin, and various trichothecene" in unit 307.

Ordog sought to testify that Dee's exposure to mold in unit 307 caused her ailments. According to Ordog, as a result of mold exposure, Dee suffered an increased risk of developing all kinds of cancer and was at an even greater risk of developing lung cancer and cervical cancer. Ordog opined that mold exposure caused Dee mental deficiencies, including dementia, memory loss, migraine headaches, and toxic leukoencephalopathy (a poisoning of the white matter of the brain). Ordog intended to testify that, as a result of Dee's exposure to mold, she suffered abdominal pain and gastrointestinal bleeding, irritable bowel syndrome, fibromyalgia (chronic joint and musculoskeletal pain), and chronic fatigue immune deficiency syndrome. Ordog further concluded that Dee suffered from dyspnea characterized by difficulty breathing and reactive airway disease as a result of mold exposure. In addition, he explained, as a result of her mold exposure, Dee suffered from multiple chemical sensitivities and an infection in her nails, and skin rashes. He concluded that her high ELISA test for mycotoxins indicated that if she conceived a child, the child was at risk for birth defects.

Ordog's assumptions were challenged on cross-examination. Most significantly, Ordog acknowledged that no mycotoxin was found in unit 307 at the time Dee was living there. Specifically, Ordog admitted that trichothecene,

aflatoxin, and satratoxin were not identified on the premises between January 1, 2001, and June 5, 2001.[3]

Based on section 801, the court excluded evidence of a causal connection between toxic mold and cancer. "[H]is testimony at the 402 hearing . . . was conclusive that he has no sufficient evidence of a causal connection." The court excluded Ordog's proposed testimony on a causal connection between toxic mold exposure and cancer, brain damage, reproductive harm, and future birth defects based on section 801. The court further concluded that Ordog's testimony lacked foundation because there was no proof "that the inhalation of mycotoxins caused her injury." The court explained that it "listened carefully to Dr. Ordog, and I [concluded] that what I heard was in the main speculation; and when it wasn't speculation, it was 'I know it when I see it,' and 'I know it based on my experience'; and we don't know what that experience was."[4]

b. *Dr. Gunnar Heuser: Section 402 Hearing*

Gunnar Heuser, another physician, specialized in clinical toxicology and treated patients who claimed to be sick as a result of toxic exposure. Gunnar Heuser did not testify at the section 402 hearing. Instead, Dee's counsel asked the court to read portions of his deposition testimony. The court permitted this procedure but warned counsel that the deposition testimony must establish the requisite foundation.

Heuser's proposed testimony was similar to that of Ordog. Heuser treated Dee from May 2003 to February 2004. According to Dee's counsel, Heuser sought to opine "with respect to cancerous nature of the mycotoxins that are at question here." Heuser also intended to opine that Dee suffered from toxic encephalopathy, asthma, skin problems, hair loss, immune deficiencies, chronic fatigue and chronic pain, migraine headaches, fibromyalgia, amenorrhea, and dry eyes due to mold exposure. Like Ordog, Heuser relied on the SPECT scan for part of his assessment, and on the reports from Immunosciences Laboratories.

---

[3] Ordog indicated that Dee probably ingested mycotoxins in her food because it was stored and prepared in a contaminated area, and he believed the bread she ate was contaminated because it was in a contaminated apartment. However, on cross-examination, he acknowledged that he did not know if she ate bread.

[4] In excluding Ordog's proposed testimony on causation, the court also relied on section 352: "the prejudice to the defendants of stating a risk of contracting these maladies or stating to the jury the fact that as a result of it, she has contracted, or any permutations of that, clearly outweighs whatever sliver there may be of proof in that area."

Heuser concluded: "[M]old toxin is probably what gives her the cognitive impairment, the fatigue, the headaches, and also the fibromyalgia." Heuser knew nothing about the quantity or amount of exposure necessary to cause a carcinogenic effect, nor about the amount of any "mold toxin" to which Dee was exposed. The trial court found Heuser's proffered testimony did not satisfy the foundational requirements of section 801 to be admissible on the issue of causation The court further concluded that Heuser's opinions could not be referred to because they were not subject to an in-court examination.

### c. Dr. Juan Manuel Gutierrez: Section 402 Hearing

Juan Manuel Gutierrez was a clinical neuropsychologist. According to his testimony, the job of a neuropsychologist was "[t]o assess the different functions of the brain to see if there's any impairments." He evaluated Dee in June 2003. He opined that Dee suffered from toxic encephalopathy, disturbance of smell and taste, and mood disorder due to toxic encephalopathy. He believed Dee's impairment was caused by mycotoxins. He based this conclusion on his experience "with mold exposures," his training, and literature he reviewed.

Gutierrez used the SPECT scan of Dee to complement his evaluation and verify the pattern of deficiencies on his neuropsychological testing. Gutierrez concluded that Dee was exposed to mycotoxins based on Dee's own account and on records from Ordog. He acknowledged, however, that "[a]s a non-physician, I can't necessarily delve into this component blood analysis very much, but I must have some sense of there being a toxin exposure, a possibility of one."

The court found that Gutierrez was qualified as an expert. Subsequently, the court further clarified that Gutierrez could testify regarding the tests he administered, the scores on the tests, and whether the scores fell within a normal range. "He can testify on the things in his field. He can testify to the test[s] that he gave. He can testify to the scoring of the tests." The court further explained Gutierrez "can also testify as to her personality and his observations thereof, to her behavior, to her feelings . . . and emotions and her relationships, but he cannot attribute it to . . . medical or organic causes. He may not label them brain damage or brain injury. That is a medical decision."

The court concluded that there was nothing in Gutierrez's background that would provide him with the expertise to opine that Dee's emotional problems

" 'directly flow from her exposure to mold.' " Because there was no admissible testimony Dee suffered from brain damage, the court found inadmissible Gutierrez's proposed testimony that Dee suffered from brain damage caused by exposure to mold. The court permitted Dee to revisit the issue "if and when somebody is going to testify to a high degree of medical probability that she has suffered brain damage."

## 5. *Trial*

The case was tried to a jury. The jury heard testimony from (1) persons knowledgeable about mold, (2) Dee, (3) Dee's treating and expert physicians, (4) PCS employees, (5) persons knowledgeable about the air conditioner at Mammoth Park Towers, and (6) respondents' experts.

### a. *Mold*

Several witnesses testified about the mold analyses of unit 307. On June 1, 2001, Michaels found stachybotrys near the doorway of Dee's unit and recommended PCS consider moving Dee out of the unit until the source of the mold was abated. The June 1 test required the walls in unit 307 to be opened for visual observation, which is referred to as "destructive testing," and Michaels did not require Dee to remain outside the unit while he tested the unit.

The presence of stachybotrys in unit 307, did not, in itself, demonstrate a danger to Dee. Sharon K. Harney, a microbiologist, testified that "there is nothing particularly significant about finding stachybotrys in an air sample." Brian Daly, the technical director at Hygiene Technologies International, Incorporated, who surveyed Dee's apartment for fungal growth, testified that the quantity and type of mold spores were normal at the time Dee occupied the apartment. He concluded that stachybotrys growth at the time Dee was living in unit 307 did not create a dangerous situation and did not "guarantee" the existence of mycotoxins. He also reviewed Michaels's reports and concluded that, in May, the airborne spore counts "were rather ordinary" and were suggestive of "pretty normal conditions."[5] Michaels testified that the source of the stachybotrys was undetermined; it could have entered through the window or on someone's shoes.

---

[5] In addition to testifying about tests conducted on May 14, Daly also conducted tests after Dee had left unit 307. He reported that (1) on July 31, 2001, unit 307 contained mold including stachybotrys and remediation was necessary, and (2) on November 28, 2001, the conditions in unit 307 did not pose a health hazard to occupants beyond that posed by outdoor environments.

Chuck McCabe testified that only an "extremely minor" amount of mycotoxin, specifically gliotoxin, was found on June 14, 2001, two weeks after Dee had moved out of unit 307. No other evidence showed mycotoxins in unit 307 during or after her occupancy.

### b.  *Dee*

Prior to moving into Mammoth Park Towers, Dee had complained about mold in another apartment building. When she moved into unit 307, Dee noticed stains on the carpet and around the doorframe. In January 2001, Dee first started experiencing health effects including dizziness, fatigue, diarrhea, vomiting, bloody nose, migraines, itchiness, redness on her feet and hands, confusion, chills, depression, hair loss, stomach, back, head and neck aches, and the absence of menstruation. Dee also had problems breathing, tightness in her chest, excessive heartburn, burning skin, food sensitivities, hives, and eye infections.

Dee met several times with PCS employees to discuss the mold in unit 307. In April 2001, Dee demanded to be relocated; PCS agreed only to replace the drywall and repair the roof or allow Dee to move out. Dee asked for Michaels's reports but was not immediately given them.

Dee testified regarding her fear of cancer and her concern over her exposure to stachybotrys and over her abnormal pap smear (a cervical cancer detection test). Dee was devastated by Ordog's recommendation that she receive annual cancer tests. The court did not allow Dee to testify regarding the contents of articles she read, which she claimed supported her fear of cancer.

### c.  *Dee's Doctors*

Although their testimony was limited, Ordog, Heuser, and Gutierrez each testified during trial. Ordog testified that Dee was healthy before she moved into unit 307 and then suffered from a multitude of symptoms. Ordog testified that Dee's symptoms were consistent with mold exposure. Ordog discussed Dee's fear of cancer with her. Hueser testified regarding Dee's symptoms and her fear of cancer and tests that he recommended she undergo including neuropsychological testing.

Gutierrez conducted those neuropsychological tests recommended by Heuser and documented for the jury all of the tests he administered to Dee

and the results of those tests. Notwithstanding objections to Gutierrez's efforts to link Dee's results to her exposure to mold, Gutierrez testified that Dee met the criteria for toxic encephalopathy.

Dr. David Alessi, an otolaryngologist (ear, nose, and throat physician) treated Dee. According to him, Dee suffered from mucoid nasal drainage, watery eyes, stickiness of her eyelids, fatigue, periorbital pain, headaches in her temples, swollen lymph nodes, hot flashes, sore throat, vertigo, lightheadedness, nosebleeds, rashes, worsening hair loss, shortness of breath, plugging of her ears, nausea, vomiting, and loss of hearing. Alessi diagnosed Dee with an inner ear problem, chronic inflammation in her nasal cavity, chronic rhinitis and inflammation of her voice box. Dee informed Alessi that she had been exposed to aspergillus, stachybotrys, and penicillium for a period of five months. Alessi opined Dee's disorders were caused by mold exposure.

Additional treating physicians testified. Dr. Andrew Kochan specialized in physical medicine and rehabilitation and treated Dee for pain and fatigue. He opined that people with exposure to mold toxins generally develop musculoskeletal pain complaints and often develop chemical sensitivities. Dr. Edward Michael Feldman, a gynecological surgeon, testified that Dee had an abnormal pap smear but further tests revealed that none of her cells were either malignant or premalignant.

### d.  *PCS Employees*

PCS employees testified regarding leaks at Mammoth Park Towers and mold in unit 307. When Dee complained about the mold, Thaler told Dee that she could move but did not agree to give Dee moving costs. Thaler testified that PCS did not have a policy with respect to mold remediation. At the beginning of May, Thaler attempted to test unit 307, but Dee would not allow access to her apartment. Thaler was told on May 23, 2001, that Scope Laboratories had found two spores of stachybotrys and that further testing was necessary. Scope Laboratories did not recommend moving the tenants until further testing was done. Thaler testified that PCS attempted to conduct additional testing on May 25, 2001, but Dee's attorney requested the tests be conducted on June 1, 2001. Once the additional testing was completed, Dee was moved out of unit 307 on June 1, 2001.

Karl Niemiec, a part-time apartment manager, recommended that PCS not rent unit 307 because of mold. Other PCS employees, including Shannen

Meddock, Bradley Palfrey, and Javier Ledezma had noticed leaks or wet spots in or around unit 307. Javier Ledezma, a PCS employee, had noticed a leak from the roof.

### e. *Persons Knowledgeable About the Air Conditioner*

Trial included testimony about the installation and repair of the air-conditioning unit at Mammoth Park Towers. Sylmar Air Conditioning and Heating (Sylmar) was responsible for installing the air-conditioning unit at Mammoth Park Towers. There had been questions regarding whether the drain line was adequate to support the air conditioner but Sylmar did not change the drain line and would not repair it. Paul Bennett, an engineer hired to determine if there was a problem with the air conditioner, concluded that the unit was properly installed but noticed a lack of maintenance.

### f. *Respondents' Experts*

Respondents challenged the link between Dee's symptoms and exposure to mold. Dr. Marion Joseph Fedoruk, a board certified physician in occupational medicine with certifications in medical toxicology and industrial hygiene, testified that Dee's complaints were inconsistent with a toxic mold reaction, and that there is no scientific evidence to link mold to cognitive deficits.[6] Dr. Theodore Hariton, a gynecologist, testified that no literature identifies a link between exposure to toxic mold and cancer, and that Dee's abnormal pap smear was not a precursor to cancer. Dr. Gary Rachelefsky, an immunologist, questioned Alessi's findings and testified that stachybotrys is not harmful in an indoor environment.

Respondents' experts included a psychiatrist and a psychologist, both of whom questioned Gutierrez's findings. Lester Zackler, a psychiatrist, concluded after examining Dee that she suffered from an adjustment disorder characterized by both anxiety and depression and an undifferentiated somatoform disorder which accounted for her symptoms. Dr. Arnold Purish, a clinical psychologist, diagnosed Dee with depression and somatoform disorder.

### 6. *Argument*

### a. *Dee's Argument*

Dee argued that there was a chronic water leak and that her apartment was not completely renovated as PCS had advertised. She argued that the

---

[6] Although Ordog's testimony had been limited, Fedoruk testified to his understanding that Ordog had diagnosed Dee with mycotoxicosis, or mold poisoning.

air-conditioning unit was improperly installed and was defective. In addition to a leak from the air-conditioning unit, there was also a backup in a drain line. "[W]ith respect to the duty on the part of the landlord to fix this, they failed miserably. We believe it was . . . not only . . . negligence . . . but intentional, reckless . . . ." Counsel argued that Thaler should have performed tests for mold prior to May 14, 2001, and should have moved Dee out prior to June 1, 2001. Counsel argued that Dee was not timely given the May 14 or the June 1 report indicating the existence of stachybotrys and other molds that can cause serious health effects and was not evacuated prior to the destructive testing.

Dee's counsel reminded the jury of her numerous symptoms and noted her journal as evidence of her symptoms. Ignoring the absence of evidence of brain injury, the absence of evidence of mycotoxins, and the limitations on Gutierrez's testimony, counsel argued that Alessi "testified that Ms. Dee's exposure to those mold and mycotoxins were the cause of her brain impairment, which confirms what the neuropsych [sic], Dr. Gutierrez, determined." With respect to mycotoxins, Dee relied on McCabe's analysis. Counsel argued that mycotoxins are "the toxic substances that are basically excreted from mold. . . . These are the things that in addition to the spores that are going around getting in your lungs and your food . . . ."

### b. *Respondents' Argument*

Respondents argued that May 23, 2001, was the first time PCS received information about the mold in unit 307. On May 27, PCS attempted to conduct additional testing but Dee refused. On June 1, 2001, as soon as PCS learned of a potential health hazard, it moved Dee into another PCS property. Respondents criticized Ordog and Gutierrez, and argued that there was no evidence that any mold detected in Dee's unit was sufficient to cause illness. Counsel urged the jury to "[s]ay 'no' to speculation."

### 7. *Jury Verdict and Judgment*

The jury returned a special verdict, finding none of the respondents negligent. Because the jury found no negligence, it was not required to determine whether the purported negligence was a substantial factor in causing harm to Dee. The jury was asked to apportion fault and found no person or entity, including Sylmar, negligent.

The jury concluded that no respondent either intended to cause Dee emotional distress or acted with reckless disregard of the probability that Dee

would suffer emotional distress. Therefore, the jury was not required to decide whether the conduct of any respondent was a substantial factor in causing Dee severe emotional distress. It found that no respondent intentionally failed to disclose an important fact that Dee could not reasonably have discovered. It found no respondent guilty of oppression or malice. Judgment was entered in favor of respondents. Dee was ordered to pay costs in the amount $331,167.52.

## DISCUSSION

Dee argues that the trial court erred in (1) excluding Ordog's, Heuser's, and Gutierrez's proposed testimony, (2) excluding evidence and rejecting instructions on her fear of cancer, (3) refusing to give instructions that were untimely presented, (4) demonstrating a bias towards Dee, and (5) awarding costs greater than $51,422.85. We consider these arguments seriatim.

### 1. *Exclusion of Expert Testimony*

Dee argues the trial court erred in excluding the testimony of Ordog, Heuser, and Gutierrez regarding "causation of Dee's symptoms, including brain damage as a result of her exposure to . . . toxic mold." The purpose of the excluded expert testimony was to show that "PCS's negligence in allowing the growth of the toxic mold was a substantial factor in directly and proximately causing [her] brain damage." We find no abuse of discretion in excluding the evidence and further conclude that, even if there was error, it was not prejudicial.

#### a. *Dee Demonstrates No Abuse of Discretion*

We review for abuse of discretion the trial court's decision to exclude evidence under section 801 on the grounds that there is no reasonable basis for the opinion. (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563 [10 Cal.Rptr.3d 34].) Section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is . . . [¶] . . . [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

■ "[E]ven when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support . . . or on speculative or conjectural factors . . . has no evidentiary value . . . and may be excluded from evidence. [Citations.]" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [8 Cal.Rptr.3d 363], citations omitted; see also *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 [11 Cal.Rptr.3d 653] ["expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural . . ."].) "Therefore, an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." (*Jennings v. Palomar Pomerado Health Systems, Inc., supra*, 114 Cal.App.4th at p. 1117, italics omitted.)

These principles were applied in *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1311–1312 [41 Cal.Rptr.3d 80] (*Geffcken*), another case involving a challenge to the testimony of Ordog. In *Geffcken*, the plaintiffs claimed to have been exposed to mold mycotoxins at their residence, and one plaintiff also claimed to have been exposed to mycotoxins at her work. (*Id.* at p. 1301.) Ordog sought to testify that exposure to mycotoxins caused one plaintiff "to suffer from lung cancer, neurological problems, respiratory problems, immune deficiency, fibromyalgia, infections on her tongue, toenails, and skin, chronic fatigue, weakness, memory loss, and headaches." (*Id.* at p. 1302.) With respect to the other plaintiff, Ordog sought to opine that "[e]xposure to mycotoxins had caused him to suffer from chronic fatigue, immune dysfunction, neurological problems, respiratory problems, reactive airway disease, elevated liver enzymes, and chemical hepatitis of the liver." (*Ibid.*) No tests confirmed the presence of mycotoxins. (*Ibid.*) Ordog relied upon two tests, one purporting to demonstrate exposure to mycotoxins and the other the presence of antibodies produced by exposure to mold. (*Id.* at pp. 1302–1303.) The trial court granted the defendant's motion to exclude Ordog's proposed testimony. (*Id.* at pp. 1305–1306.)

The Court of Appeal affirmed. It found that, "[i]n view of the absence of any reliable evidence that appellants had been exposed to mycotoxins at the properties in question, Dr. Ordog's opinions were speculative and conjectural." (*Geffcken, supra*, 137 Cal.App.4th at p. 1311.) *Geffcken* further held that Ordog could not rely on the antibody test or blood serology test because

those failed to satisfy *Kelly* requirements. (*Id.* at p. 1312.) "Irrespective of whether he had the requisite qualifications, the trial court did not abuse its discretion in impliedly finding that there was no reasonable basis for his opinion that the exposure to mycotoxins had caused appellants' ailments." (*Id.* at p. 1311.) No one had tested for mycotoxins. (*Id.* at p. 1312.)

Here, as in *Geffcken*, Dr. Ordog and others sought to testify that Dee's exposure to mycotoxins caused her symptoms and her susceptibility to cancer without any evidence that Dee was exposed to mycotoxins. Ordog's, Heuser's, and Gutierrez's opinions relied on an incorrect premise, and thus their opinions lacked evidentiary value. (*Lockheed Litigation Cases, supra*, 115 Cal.App.4th at p. 564 ["An expert opinion has no value if its basis is unsound."].) Although a minute amount of gliotoxin was found weeks after Dee moved out of her apartment, nothing in the record supports a causal connection between a minute amount of gliotoxin and any illness. Thus, as in *Geffcken*, the opinions of Drs. Ordog, Heuser, and Gutierrez were based on speculation and conjecture. (See *Jennings v. Palomar Pomerado Health Systems, Inc., supra*, 114 Cal.App.4th at p. 1117 ["[W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value . . . ."].) Finally, as in *Geffcken*, Ordog, Heuser, and Guttierez relied on a SPECT scan and blood tests that failed *Kelly* requirements (an issue undisputed on appeal). There was no abuse of discretion in determining that Ordog's, Hueser's, and Gutierrez's opinions lacked foundation.[7]

Dee's reliance on *Roberti, supra*, 113 Cal.App.4th at page 901, is misplaced. *Roberti* held that expert medical opinion is not subject to the admissibility test of *Kelly*. Thus, in *Roberti*, it was error to exclude the plaintiff's expert testimony on causation where "Plaintiff's experts based their opinion testimony upon research papers and studies (primarily those conducted on animals) in peer-reviewed journals . . . and to some extent upon physical examination of plaintiff using techniques that are generally accepted in the relevant medical community. They did not rely upon any new scientific technique, device, or procedure that has not gained general acceptance in the relevant scientific or medical community." (*Roberti, supra*, 113 Cal.App.4th at p. 901.)

In contrast to *Roberti*, here the trial court did not exclude the expert testimony based on *Kelly*. Instead, it relied primarily on section 801, which

---

[7] Because the evidence was correctly excluded under section 801, we need not consider the court's additional grounds for excluding the testimony of Ordog, Heuser, and Gutierrez. (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173 [222 Cal.Rptr. 800]; *Bohn v. Gruver* (1931) 111 Cal.App. 386, 396 [295 P. 891].)

Dee acknowledged required her to establish a foundation.[8] Also, in contrast to *Roberti*, Dee's experts sought to rely on techniques that had not gained acceptance in the relevant scientific community, specifically the SPECT scan and blood tests. *Roberti* emphasized that the experts in that case "did not rely upon any new scientific technique, device, or procedure that has not gained general acceptance in the relevant scientific or medical community." (*Roberti, supra,* 113 Cal.App.4th at p. 901.) Finally, as Heuser himself acknowledged, "most doctors do not know anything about mold because mold has not been discussed in the regular medical journals. It's an emerging field of medicine." Thus, the instant case is unlike *Roberti*, where the testimony offered by plaintiff's experts "both had the tendency in reason to prove causation, and was based on studies and protocol of a type that reasonably may be relied upon by a medical expert witness." (*Roberti, supra,* 113 Cal.App.4th at p. 906.)

b. *Any Error in Excluding Dee's Expert Testimony Was Harmless as a Matter of Law*

Even had we found error in the trial court's exclusion of Ordog's, Heuser's, and Gutierrez's proposed testimony on causation, Dee cannot demonstrate prejudice. She argues that the excluded evidence was necessary to show that "PCS's negligence in allowing the growth of the toxic mold was a substantial factor in directly and proximately causing [her] brain damage." The jury, however, was not required to reach the issue of causation because it found none of the respondents negligent. Accordingly, the rulings Dee challenges on appeal were relevant to a question the jury was not required to decide. Thus, even if Dee could demonstrate error, it would not require reversal.[9] (Cal. Const., art. VI, § 13 [no judgment shall be set aside based on the improper admission of evidence unless the error resulted in a miscarriage of justice].)

2.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[8] In the trial court, Dee acknowledged that section 801 requires the trial court to determine if there is a foundation for the expert's testimony. Counsel agreed the following scenario would not satisfy section 801: A doctor is asked, " 'What's the authority for using this machine' " and replies, " 'I just use it. I don't have any authority. I use it; and I pick up its readings, and they assist me' . . . 'they confirm what I conclude.' " The doctor further indicates, " 'I like the color of the machine. It's really cool. It's attractive and it looks really professional, and that's all I have.' "

[9] Dee discusses the substantial factor rule and general causation. Her specific contention is unclear. However, to the extent she contends the test for general causation is incorrect, that argument is irrelevant because the jury, having found no negligence, was not required to consider causation.

*See footnote, *ante*, page 390.

## DISPOSITION

The judgment is affirmed. Respondents shall have their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

On May 28, 2009, the opinion was modified to read as printed above.