Filed 1/25/22  P. v. Williams CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER MICHAEL WILLIAMS,<br><br>Defendant and Appellant. | C090766<br><br>(Super. Ct. No. STKCRFE20060008049, SF099265C ) |

In 2007, a jury found defendant Christopher Michael Williams guilty of multiple offenses, including the first degree murder of Conrad Celestine.  We affirmed his convictions in *People v. Miller et al.* (Mar. 10, 2010, C056951) [nonpub. opn.] (*Miller*), but modified his sentence to 28 years eight months to life in state prison.  Regarding his first degree murder conviction, we found substantial evidence showed he aided and abetted the actual killer with the intent to kill.

While he was serving his sentence, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015, §§ 1-4), which

amended the law governing murder liability under felony-murder and natural and probable consequences theories and provided a new procedure under Penal Code section 1170.95[1] for eligible defendants to petition for recall and resentencing. Defendant filed a section 1170.95 petition, which the trial court denied after issuing an order to show cause, obtaining briefing, and holding a hearing.

Defendant appeals, arguing the trial court erred in determining he was ineligible for resentencing. He contends the trial court applied an incorrect burden of proof and an inapplicable felony-murder rule standard as well as improperly relied on our prior opinion in denying his petition. He also argues the trial court violated his constitutional rights to equal protection and due process by not providing him with a complete copy of the trial transcript.

On this record, we conclude the trial court was aware of and applied the correct beyond a reasonable doubt burden of proof, that it did not consider the matter a felony-murder case, and that the trial court relied on more than this court's prior opinion, including evidence from defendant's original trial, in properly denying the petition. We also conclude any alleged error regarding the transcripts was invited. We therefore affirm the trial court's denial of defendant's section 1170.95 petition for resentencing as he was not eligible for relief.

FACTUAL AND PROCEDURAL BACKGROUND

To facilitate our review of the court's order denying defendant's section 1170.95 petition, we incorporate the facts and proceedings from our unpublished opinion affirming defendant's convictions in *Miller*. *(Miller, supra*, C056951 [at pp. 2-14 ]).[2]

---

[1] Further undesignated statutory references are to the Penal Code.

[2] The prosecution attached a copy of our unpublished decision in *Miller* to its informal response to defendant's petition and asked the court to take judicial notice of the opinion.

2

According to our unpublished opinion, in February 2006[3] defendants Rosetta Jefferson, the actual killer, Lacy Miller, her brother, and defendant Williams, her boyfriend, all lived at Jefferson's home in Stockton. On February 10, Jefferson asked the victims Conrad Celestine and Crystal Knowles to house sit for her while she and defendant were out of town. Jefferson's brother Miller arrived at her home on February 12, and noticed things had been moved around and some items were missing. When he confronted Celestine and Knowles, each blamed the other and an argument ensued.

Jefferson and defendant returned to Jefferson's home on February 14. Jefferson noticed rearranged furniture, soiled bedsheets, and missing personal items, including rare coins and her daughter's Pokémon card collection. Both she and defendant were upset. Miller told Jefferson that Knowles and Celestine each blamed the other for what had transpired at Jefferson's home in her absence.

Later that afternoon, Jefferson stopped by Knowles's home and lured Knowles to her house under the guise of needing help. When they arrived at Jefferson's home, Miller and defendant were there. As Knowles entered, Jefferson "stunned [her] to the ground" with a taser. Jefferson continued to stun her over 50 times while calling her names and accusing her of taking Jefferson's property. At one point, Jefferson jabbed Knowles in the face with the taser and a metal prong broke off in her eye. Jefferson threatened Knowles with a knife and cut her on her chest, arm, and leg. Defendant threw water on Knowles and stunned her at least twice. When Knowles's sister attempted to intervene, defendant told her to stop or "[b]oth of you bitches would be dead."

Knowles eventually told Jefferson that Celestine had let people into Jefferson's home while Jefferson was away. She said Celestine was in Jefferson's bedroom with

---

[3] All dates occurred in 2006 unless otherwise indicated.

some "bitch" and acknowledged smoking "dope" in Jefferson's bedroom. Jefferson wanted to kill Knowles, but defendant said they should let her go. They ultimately agreed to let her leave if she promised not to talk and told her they would kill her family if she reported them to the police.

That evening, Jefferson telephoned Celestine's home and asked to speak to Celestine. Upon being advised Celestine was unavailable, she told Celestine's stepson that property was missing from her home and that "if it didn't show up the niggers would be falling." Later that same night, Jefferson again telephoned Celestine's home and told his wife, Charolett, to "tell [Celestine] it's on, it's on."

The following morning, on February 15, Miller telephoned Celestine's home and told Celestine that he was coming over to get Jefferson's keys. A short time later, Miller rang the doorbell, and Celestine let him in; Jefferson and defendant were hiding around the corner and followed Miller into the house.

Jefferson was holding a knife in her hand and demanded to know who had been in her house. Celestine denied knowing what she was talking about. Jefferson stabbed Celestine in his side and yelled, "You going to tell me who was in my house." Charolett ran for the door, but defendant blocked the doorway and grabbed her by the arm. Charolett called out Jefferson's name and pleaded with her not to "do this." Defendant responded, "Up, you said her name, now I got to kill him," and held up a gun. By this time, Celestine was laying on the floor in the fetal position, attempting to block Jefferson and Miller's blows with his legs and arms. Jefferson stabbed him again, while Miller urged him to tell Jefferson who had her things. Miller then began "slicing and poking" Celestine with "some ninja-like" three-bladed knife while Jefferson stabbed him "nonstop" as blood poured out of his side and mouth. When Charolett pleaded with Jefferson not to kill Celestine, Jefferson responded, "This motherfucker is going to die. You going to die." Meanwhile, defendant kept saying, "I'm going to shoot him. Let me just kill him. Let's just get it over with. Let me just kill him."

4

Once they finished stabbing and cutting Celestine, Miller and Jefferson took turns kicking him in the head. Defendant then kicked Celestine in the side, and his body went limp, and his eyes rolled back in his head. Celestine had been stabbed eight times, four of which were potentially fatal. Celestine also had 12 nonfatal "incised" wounds, which were caused by a cutting or slicing action, as opposed to a stabbing motion, and multiple blunt force injuries.

After Celestine's body went limp, Miller said, "That's enough," and defendant walked out the door. Moments later, Miller and defendant returned, and Miller accused Charolett of calling for help because there was a truck with people outside. Defendant told Charolett, "If I see any police or anything here, I'll be back to finish the job to kill everybody in the house." Charolett pleaded to call an ambulance, but defendant responded, "No. Let that motherfucker die."

Shortly after Jefferson, Miller, and defendant left, Charolett heard a series of gunshots, ran outside, and saw a truck take off and drive through two fences.[4] Meanwhile, she telephoned 9-1-1 and told them she needed an ambulance but not to send the police because she feared defendant would make good on his threat. After fleeing the scene, Miller and defendant were found hiding in the backyard of a nearby residence and were taken into custody.

Both Miller and defendant testified in their own defense. Jefferson did not.

According to Miller, on the morning of February 15, (the day of Celestine's murder), Jefferson asked Miller if he had seen or heard from Celestine. Miller said, "No," and immediately thereafter, telephoned Celestine and told him he was going to stop by and retrieve Jefferson's key. The three defendants eventually walked to

---

[4] Defendant was charged with attempted murder and shooting at an occupied vehicle for allegedly shooting at the truck. Because the jury found defendant not guilty of those charges, we do not further recount the underlying facts here.

Celestine's home; they did not discuss anything on the way and Miller did not see Jefferson or defendant with any weapons. As they neared Celestine's house, they walked by a truck occupied by two people who gave them a threatening look. When they reached Celestine's house, Miller rang the bell and told Jefferson and defendant to wait outside because he "didn't want no fussing [or] arguing." Celestine answered the door and Miller went inside. Miller saw Jefferson's ninja-like knife on the entertainment center and confronted Celestine about taking things from Jefferson's home. Celestine began screaming at Miller, and Jefferson went inside and began screaming at Celestine to "give me my keys." Celestine grabbed a gun off the entertainment center and started to point it at Miller. Miller hit Celestine in the face, and Celestine dropped the gun and fell to his knees. As Celestine went to pick up the gun, Miller grabbed the ninja-like knife. When Miller turned back around, Celestine had the gun pointed at him. At that point, Jefferson stabbed Celestine in his side, and Miller began "swinging" the ninja-like knife. Miller could not recall anything after that point in time. The next thing he recalled was being ordered to "get down" by police.

Miller was aware of violent incidents in Celestine's past and knew Celestine "could react in a violent fashion." He had "heard about shootings and about [Celestine] . . . hitting a certain woman and making her do stuff" at gunpoint. Miller had also observed Celestine push Knowles's sister over a table.

In 1990, Celestine threatened a woman with a gun and thereafter was not "crime free."

Defendant testified that he was present when Jefferson unexpectedly stunned Knowles. He urged Jefferson to take Knowles in the back bedroom so that they could talk calmly. While in the bedroom, Jefferson slapped Knowles, "but nobody else did anything . . . to her, no kicks, no broken noses." During cross-examination, however, defendant acknowledged Jefferson punched Knowles in the face.

6

Defendant denied stunning or striking Knowles or threatening her or her family. He threw water on Knowles because she said she was thirsty. When he did so, he believed Jefferson was done stunning her; he was not trying to electrocute her. At some point, Jefferson "poked" Knowles with a knife.[5] Defendant did not attempt to stop Jefferson other than eventually telling her to "[c]ut it out, let her go." After Knowles left, defendant went to a friend's house.

Defendant returned to Jefferson's home around 10:00 p.m. that night and learned Jefferson had been attempting to contact Celestine while he was gone. Jefferson was pretty upset.

The next morning, Jefferson was anxious to get her keys from Celestine, and defendant agreed to accompany her and Miller to Celestine's home. He denied bringing any weapons with him or knowing that Miller and Jefferson were armed. He went to retrieve Jefferson's keys but did not intend to assault anyone.

When they arrived, Jefferson and Miller went inside while defendant remained outside with Charolett. Defendant could hear people arguing but did not go inside because he "had no business in that conversation." When the argument turned physical, he ran inside. He saw a gun on the floor and immediately picked it up. He also saw Celestine on his back attempting to fight off Miller and Jefferson as they stabbed and cut him. As soon as defendant picked up the gun, Charolett pulled him out of the house. Defendant told Jefferson and Miller to come out, and they did. Defendant denied striking Celestine, threatening anyone, or preventing Charolett from going anywhere.

Defendant told Charolett, "No, don't call the police. It's not going to do any good for anybody," including Celestine. Although he believed Celestine had been beaten up,

---

[5] Defendant initially testified that Jefferson waved a knife at Knowles, but it did not appear that she was poking her with it. On cross-examination, he admitted seeing Jefferson "poke [Knowles] in the skin."

he did not know he was mortally wounded. He did, however, tell Charolett she could call an ambulance.

Defendant eventually threw the gun into a garbage can and returned to Jefferson's house. Soon thereafter, he heard the police arrive, and he and Miller climbed out a back window and hopped the fence.

The jury found defendant guilty of the first degree murder of Celestine, false imprisonment by violence of Charolett, dissuading a witness (Charolett) by force or threat, assault by means of force likely to produce great bodily injury upon Knowles, and possession of a firearm by a felon. It also found true allegations that he used a handgun in the commission of the murder, and a knife and a taser in the commission of the assault. He was initially sentenced to an aggregate term of 31 years to life in state prison, which this court subsequently reduced on appeal to 28 years eight months to life. On appeal, this court found sufficient evidence supported defendant's first degree murder conviction because the evidence at trial showed Jefferson intended to kill Celestine, that she premeditated and deliberated the murder, and that defendant knew of and shared Jefferson's murderous intent.

In January 2019, defendant filed a form petition for resentencing pursuant to section 1170.95. On the form, he checked various boxes stating that a complaint was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine, that at trial he was convicted of first or second degree murder pursuant to the felony-murder rule or the natural and probable consequences doctrine, and that he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. He requested the appointment of counsel.

The trial court issued an order to show cause and appointed defendant counsel. The prosecution filed a written response arguing Senate Bill 1437 was unconstitutional and that defendant was not entitled to relief because, as we found in *Miller* and as the

8

evidence presented at trial overwhelmingly showed, he shared Jefferson's murderous intent and he directly aided and abetted Celestine's murder. The prosecution requested that the trial court judicially notice this court's opinion in *Miller* and attached a copy to its response.

In June 2019, defense counsel filed a response asserting Senate Bill 1437 was constitutional. While counsel acknowledged that the prosecution presented two theories at trial for defendant's murder liability—that defendant was either an aider and abettor of the actual killer, or that he was an aider and abettor of an assault with a deadly weapon, the natural and probable consequences being premeditated, willful, and deliberate murder—defense counsel claimed, given defendant's own testimony and additional trial evidence referenced in a prior habeas corpus petition, that the jury could only have relied on the natural and probable consequences doctrine to find defendant guilty. According to him, the prosecution and the trial court could not now substitute their own theory of liability for that of the previous jury. Defendant's response twice referenced the applicable burden of proof under section 1170.95—that the prosecutor had to prove beyond a reasonable doubt that defendant could still be convicted of murder despite Senate Bill 1437's changes.

In September 2019, defendant filed a supplemental response. Defendant attached as exhibits the transcripts of the parties' closing arguments and the jury instructions given by the trial court as well as a jury question and the trial court's response during deliberations; he requested that the trial court take judicial notice of the attached materials. Summarizing the transcripts, counsel argued that defendant was prosecuted for Celestine's murder based solely on the legal theory of aider and abettor liability, and that the prosecutor specifically argued defendant aided and abetted Jefferson and Miller in an assault with a deadly weapon, the natural and probable consequences of which were the first degree murder of Celestine. According to defendant, the prosecutor did not allege or

argue to the jury that defendant had the specific intent to kill, or that he directly aided and abetted either Jefferson or Miller with the specific intent to kill Celestine.

Defendant's supplemental reply again highlighted the prosecution's burden under section 1170.95 to prove beyond a reasonable doubt that he was ineligible for resentencing. The supplemental response emphasized that the trial court was required "to resentence him on his murder conviction, unless the prosecution can prove beyond a reasonable doubt that he does not qualify for resentencing."

At the hearing on the petition on November 4, 2019, defense counsel requested that the trial court strike all of the references in the prosecutor's brief to the actual trial transcripts because he had not been provided a free copy of the transcripts. The trial court refused counsel's request. The trial court explained that defendant had already been provided with a free copy of the complete trial transcripts for his direct appeal, and that the court did not have a budget to pay for a second copy for defendant. The trial court, however, offered to continue the hearing to allow defense counsel an opportunity to review the transcripts. After conferring with defendant, defense counsel indicated that they wished to proceed with the hearing despite not having reviewed a complete copy of the transcripts.[6]

Defense counsel argued that the prosecution had the burden of proving beyond a reasonable doubt that defendant was not eligible for resentencing, and that the trial court could not find defendant ineligible for relief based on a theory that was never presented to his jury. The prosecutor agreed with defense counsel that because the court had issued an order to show cause, her burden was to show beyond a reasonable doubt that defendant could still be convicted of murder following Senate Bill 1437's changes. She argued that "[t]he analysis is for this Court to consider, could he be convicted of first—or

---

[6] Defendant attached copies of the transcripts of the closing arguments and the trial court's instructions to his supplemental response.

second degree murder today, and the answer has to be yes, not just based on the Third DCA's opinion, but the facts that I put forth in my brief." Based on the jury instructions given (CALCRIM Nos. 400 and 401), the prosecutor also argued that defendant was tried under both a direct aiding and abetting theory as well as aiding and abetting a target offense, the natural and probable consequences of which was a murder. Because the verdict did not specify which theory the jury relied upon, there was no way to know whether defendant was convicted as a direct aider and abettor or based on the natural and probable consequences doctrine. Nevertheless, the evidence showed that defendant could still be convicted as a direct aider and abettor with the intent to kill.

After reviewing the parties' written submissions and considering their arguments at the hearing, the trial court denied the petition, finding defendant ineligible for relief. The trial court ruled that it had initially issued the order to show cause because the jury had been instructed on the natural and probable consequences doctrine. However, the court found that "the evidence was overwhelming in many different ways that [defendant] [was] not eligible for relief." The trial court noted this court's decision in *Miller*, which found that defendant's conduct and statements before, during, and after the attack provided overwhelming evidence that he shared Jefferson's murderous intent and aided and facilitated Celestine's murder. In addition, the trial court found that defendant "was a major participant by any measure," and that "he shared the intent to kill by the bulk of the evidence . . . ." The trial court did not consider defendant's case particularly close.

Defendant timely appealed.

DISCUSSION

I

*Overview of Senate Bill 1437*

Senate Bill 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, . . . to ensure that murder liability is not imposed on

11

a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 achieves these goals by amending section 188 to require that a principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and by amending section 189 to state that a person can be liable for felony murder only if (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.)

Senate Bill 1437 also added section 1170.95 to provide the resentencing petition process for a "person convicted of felony murder or murder under a natural and probable consequences theory." (§ 1170.95, subd. (a).) After a defendant submits a petition and the court performs an initial review for missing information, subdivision (c) of section 1170.95 provides: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

Following an order to show cause, the court must hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence . . . ." (§ 1170.95, subds. (c), (d)(1).) At that hearing, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant is not eligible for resentencing. (§ 1170.95, subd. (d)(3).) "The prosecutor and the petitioner may rely on the record of conviction or offer

new or additional evidence to meet their respective burdens." (*Ibid.*) The parties also may waive a resentencing hearing and stipulate that a defendant "is eligible to have his or her murder conviction vacated and for resentencing." (§ 1170.95, subd. (d)(2).)

## II

### *Denial of Section 1170.95 Petition*

Defendant contends the trial court erroneously denied his resentencing petition based on an incorrect burden of proof and an inapplicable felony-murder theory; he also argues the court inappropriately relied on this court's prior opinion to deny the petition. These alleged errors, he argues, were structural, requiring automatic reversal, or, at the very least, they were not harmless. We are not persuaded.

It is "presumed that official duty has been regularly performed." (Evid. Code, § 664; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Trial courts, moreover, are presumed to know and apply the correct statutory and case law. (*People v. Coddington* (2000) 23 Cal.4th 529, 644, disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13. Nothing defendant cites overcomes this presumption.

He argues, based on the trial court's comments during the hearing, that the trial court applied an incorrect burden of proof in finding he had an intent to kill by the "bulk of the evidence" rather than by the statutorily required beyond a reasonable doubt standard. The trial court's comment, however, cannot be viewed in isolation. When properly viewed in context, the record affirmatively shows that the trial court was well aware that the prosecutor bore the burden of proving beyond a reasonable doubt that defendant was ineligible for resentencing under section 1170.95. (§ 1170.95, subd. (d)(3) [at a hearing to determine whether to vacate the murder conviction and recall the sentence, the prosecutor bears the burden to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing].)

13

Counsel for both parties agreed that the beyond a reasonable doubt standard found in section 1170.95, subdivision (d)(3) applied, and that it was the prosecutor's burden to meet it. The parties noted the standard in the written briefs and during oral argument at the evidentiary hearing after the trial court issued the order to show cause. And the trial court expressly stated that it had "read all the moving papers."

With the applicable beyond a reasonable doubt standard of proof highlighted by the parties, the trial court ruled that it "[did not] think this is a particularly close case." While it is true the court never used the phrase "beyond a reasonable doubt" during the hearing, defendant concedes such exact "magic words" were not necessarily required. Furthermore, the court's comment referencing our decision in *Miller* where we found that defendant's conduct and statements before, during, and after the attack provided "overwhelming evidence" that he shared Jefferson's murderous intent and aided and facilitated Celestine's murder does not mean the court held the prosecutor to some sort of "overwhelming evidence" standard of proof rather than the beyond the reasonable doubt standard called for in section 1170.95. The same applies to the trial court's "bulk of the evidence" comment regarding defendant's intent to kill. We interpret the trial court's statements to mean simply that, in the trial court's view, the case for relief was not even close because the evidence overwhelmingly showed defendant directly aided and abetted Jefferson with the intent to kill Celestine. Thus, the trial court was implicitly convinced beyond a reasonable doubt that defendant was not eligible for resentencing.

Similarly, the trial court's comment that the evidence showed defendant was "a major participant by any measure" does not mean, as defendant contends, that the trial court was laboring under the misapprehension that the felony-murder rule applied. Neither party, we note, ever argued that the felony-murder rule applied to defendant's case since the assault on Celestine merged with the homicide, making the felony-murder rule inapplicable. (*People v. Chun* (2009) 45 Cal.4th 1172, 1200 ["[w]hen the underlying felony is assaultive in nature . . . the felony merges with the homicide and cannot be the

14

basis of a felony-murder instruction[;] [a]n 'assaultive' felony is one that involves a threat of immediate violent injury"].)  The court, moreover, did not find that defendant was a major participant *who acted with reckless indifference to human life* as required by the amended felony-murder rule in section 189, subdivision (e).  (§ 1170.95, subd. (e)(3).)  The comment, when considered against the backdrop of all the evidence presented on the petition, shows that the trial court believed defendant's participation in the murder was not merely as a passive participant as his counsel argued, but rather that he directly aided and abetted the murder.

We are also not persuaded that the trial court was misguided by defense counsel's reference to the trial court as a reviewing court that could not substitute its own feelings about the credibility and strength of the evidence.  As the People point out, the prosecutor emphasized that ruling on the petition was a postconviction proceeding where, as when applying Propositions 36, 47, and 64, courts could consider the strength and credibility of the evidence.  And the trial court expressly found that "[it did not think it] was a particularly close case" as opposed to finding that some hypothetical jury could still have found defendant guilty beyond a reasonable doubt.

Defendant's contention that the trial court erred in relying on this court's prior opinion to deny relief is likewise without merit.  An appellate opinion is part of the record of conviction that the trial court may consider under section 1170.95.  (See, e.g., *People v. Lewis* (2021) 11 Cal.5th 952, 971-972 *(Lewis)* [after appointment of requested counsel and consideration of briefs, a trial court may consider the record of conviction, including a prior appellate court opinion, in determining whether a petitioner has made the single prima facie showing required under section 1170.95, subdivision (c)]; *People v. Woodell* (1998) 17 Cal.4th 448, 456 [an appellate opinion is a part of the record of conviction]; see also, § 1170.95, subd. (d)(3) [the parties may rely on the record of conviction to meet their respective burdens during evidentiary hearing].)  In any event, while it is true the trial court cited our prior opinion in denying the petition, the

prosecutor specifically referenced evidence admitted at trial in her responsive brief and the trial court refused to strike the evidence when defense counsel requested that it do so at the hearing because it believed considering all the available evidence was appropriate. Defendant's supplemental response also included the transcript of closing arguments and the jury instructions for the court's consideration. The trial court recited that it had read and considered all of the moving papers, which included the evidence presented in the written submissions. Because the trial court did not solely rely on this court's *Miller* opinion to deny the petition, the fact that we applied a substantial evidence standard of review on appeal is irrelevant.

To the extent defendant argues that it is unclear whether the jury convicted defendant on a direct aiding and abetting theory or a natural and probable consequences theory, the controlling question for eligibility under section 1170.95 was whether defendant could still be convicted of murder under a theory permitted by section 188 or 189, not whether a jury relied on that same theory at trial. (§ 1170.95, subd. (a)(3).) Likewise, the proper inquiry on the petition was not whether the jury instructions given during his trial are still valid in light of subsequent changes in the law, but whether the prosecutor proved beyond a reasonable doubt that defendant could still be convicted of murder under the newly revised statutes. (§ 1170.95, subds. (a)(3), (d)(3).)

Senate Bill 1437 did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' " (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135, abrogated on other grounds in *Lewis, supra*, 11 Cal.5th 952.) "One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*People v. Lewis, supra*, 43 Cal.App.5th at p. 1135.) The trial court implicitly found that defendant aided and abetted Celestine's killing with a murderous intent. Substantial evidence amply supports the trial court's conclusion. (*People v. Lopez* (2020) 56 Cal.App.5th 936, 953

16

[sufficiency of the evidence standard applies when reviewing postjudgment denial of a petition for resentencing under section 1170.95 following issuance of an order to show cause and evidentiary hearing], review granted February 10, 2021, S265974.)

The evidence at trial showed defendant was present when Jefferson first attacked Knowles, stunning her over 50 times with a taser, cutting her multiple times with a knife, and physically assaulting her because she was so outraged that Knowles had allowed people into her home while housesitting for her. Defendant threw water on Knowles and stunned her at least twice; he also drop-kicked her in the face with his boot. During the attack defendant threatened Knowles's sister not to intervene or else both she and Knowles "would be dead." Defendant later threatened Knowles that if she told anyone of the attack, they would come back and kill her family.

Having witnessed and participated in the attack on Knowles, the next day defendant accompanied Jefferson and Miller to Celestine's house. Each was armed with a weapon, defendant with a gun and Jefferson and Miller with knives. Defendant brandished his gun and prevented Charolett from escaping the apartment to get help while Jefferson and Miller continuously stabbed Celestine as he lay defenseless on the floor. During the stabbing defendant threatened to shoot Celestine if Charlotte tried to help him, and also stated, "Let me shoot him. Let me shoot him." He told Charlotte he was "going to shoot him," and repeatedly told Jefferson, "Let me just kill him. Let's just get it over with. Let me just kill him." Defendant said he had to kill Celestine after Charlotte said Jefferson's name when begging her to stop, and later kicked him in the side causing Celestine's body to jump and go limp. He threatened to finish the job and kill everyone in the house if he saw any police, and when Charlotte asked if she could call an ambulance defendant responded, "No. Let that mother fucker die."

Given the above, more than sufficient evidence supports the trial court's finding that defendant shared Jefferson's murderous intent and aided and abetted Jefferson in

17

killing Celestine. The trial court applied the correct standard of proof and did not err in denying defendant's petition.

III

*Equal Protection and Due Process Rights to Access to Complete Trial Transcript*

Defendant contends the trial court's refusal to provide a second copy of the complete trial transcript, free of charge, before ruling on the petition violated his rights to equal protection and due process. The People argue defendant had adequate alternatives to review the transcript, and also invited the alleged error. We agree that any alleged error was invited.

We need not decide whether the parameters of the equal protection or due process clauses mandate that the State provide a second free copy of the transcript of an indigent defendant's prior trial for purposes of a postconviction hearing under section 1170.95. (See e.g., *Griffin v. Illinois* (1956) 351 U.S. 12, 18-19 [100 L.Ed. 891] [under equal protection, an indigent defendant is entitled to free transcript of prior proceedings if necessary for proper appellate review or an effective defense]; *People v. Hosner* (1975) 15 Cal.3d 60, 65-66 [extending holding in *Griffin* to require that an indigent defendant be provided the transcript from a mistrial caused by a hung jury, upon request, where the defendant seeks the transcript to aid in his defense at a retrial].) This is because the invited error doctrine bars defendant from raising the issue.

"The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest." (*People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on other grounds by *People v. Barton* (1995) 12 Cal.4th 186.) A party who, by his conduct induces the commission of an error, is estopped from asserting it as a ground for reversal on appeal. (*Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1312.) The doctrine requires affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party. (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 706.)

18

In this case, the trial court repeatedly offered to continue the hearing to give defense counsel an adequate opportunity to review the full trial transcript. After the trial court said it would not strike the People's references to the trial transcript citations in its response, but offered to give defendant more time to review the trial transcript, defense counsel conferred with defendant and agreed that they wanted to proceed with the hearing. This appears to have been a tactical decision because counsel had a "pretty good understanding" of the facts of defendant's case since he had reviewed this court's prior opinion, which set forth in detail the evidence presented at trial, and had also reviewed a habeas corpus petition defendant previously filed, which also included a summary of the evidence presented at trial. Defendant had also obtained at least a portion of the trial transcript because he attached over 200 pages of the transcript to his supplemental response, including the closing arguments and jury instructions. After further discussion about how the trial court did not have budgetary means to supply defendant with a second copy of the full trial transcript since he had already been provided with a free copy on his direct appeal, counsel again indicated that he wanted to have the hearing despite not having reviewed the entire transcript. The parties and the trial court then proceeded with the hearing.

Based on counsel's comments of the materials he had reviewed and his discussion with defendant before informing the trial court that they wanted to proceed even without having reviewed the entire trial transcript, defendant invited any alleged error by the court in electing to proceed with the hearing. He cannot now complain on appeal that he was not provided with a second free copy of the entire trial transcript before the trial court ruled on the petition.

## DISPOSITION

The order denying defendant's petition for resentencing under section 1170.95 is affirmed.

\_\_\_\_\_\\s\\_____,
BLEASE, Acting P. J.

We concur:

\_\_\_\_\_\\s\\\_\_\_\_\_,
DUARTE, J.

\_\_\_\_\_\\s\\\_\_\_\_\_,
RENNER, J.