Filed 4/18/25  Yavelak v. Antivo Los Olivos CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NICHOLAS PETER YAVELAK, | |
| Plaintiff and Respondent, | G063305 |
| v. | (Super. Ct. No. 30-2019-01074812) |
| ANTIVO LOS OLIVOS, LLC, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and postjudgment order of the Superior Court of Orange County, Craig L. Griffin, Judge. Affirmed.

Strongin, Eric B. Strongin and Daniel J. Libbey for Plaintiff and Respondent.

Wood, Smith, Henning & Berman and Steven R. Disharoon for Defendant and Appellant.

Respondent Nicholas Peter Yavelak leased an apartment from Appellant Antivo Los Olivos, LLC (Antivo) and brought an action based on alleged harm stemming from mold in the apartment. A jury found in favor of Yavelak on his claims for negligence and breach of the implied warranty of habitability, and awarded him $423,036.90. On appeal, Antivo argues the trial court erred in admitting a laboratory report (Great Plains Laboratory report). However, Antivo waived this argument. Antivo also argues there was not substantial evidence supporting breach of a duty or causation. We disagree and conclude there was substantial evidence. We affirm.

FACTUAL AND PROCEDURAL HISTORY

Antivo is an apartment community in Irvine. In January 2018, a leak from the heating, ventilation, and air conditioning (HVAC) unit occurred in the apartment that Yavelak would later lease from Antivo.

In January 2018, a team from the Irvine Company[1] performed a remediation of the apartment. At that time, Daniel Ledbetter was working for the Irvine Company as a project manager for the environmental department and he went to the apartment to develop the scope of work. Ledbetter testified he visually inspected the area and used a moisture meter to identify the wet areas to remove. The scope of work he created called for removing certain drywall, flooring, and other items in the kitchen and HVAC closet. Ledbetter testified the HVAC unit was taken out, and then the same HVAC unit was put back in after remediation was done. Ledbetter said his scope of work did not include applying fungicide or wiping down the HVAC unit. Ledbetter testified he did not recall if any special attention was given to remediating the HVAC unit before it was put back in, and while it is possible

---

[1] Testimony indicated the Irvine Company owns Antivo.

general cleaning was done to the HVAC unit, he did not recall.[2] A different Irvine Company employee performed the post-remediation certification and visual clearance process. This employee testified "everything was completed according to the scope of work," the kitchen and HVAC unit area passed his post-remediation inspection, he used a moisture reader and did not find any wet areas, and he did not take air samples.

Ledbetter further testified the Institute of Inspection Cleaning and Restoration Certification (IICRC) S520 guidelines are well accepted as the industry standard for water and mold remediation.[3] He said the Irvine Company's policies are based on those guidelines but "not following 100 percent." Ledbetter stated the workers had in-house training. Ledbetter said no photographs were taken before, during, or after the January 2018 remediation as the Irvine Company's policy was to not take photographs. Ledbetter also stated no mold testing was done in January 2018.

In March 2018, Yavelak moved into the apartment. Yavelak testified he has "a fairly critical eye" and, during his move-in inspection, he noticed certain windows had streaking residue, which he noted on his move-in inspection form. Yavelak stated Antivo said they would look into it, but it was not resolved or fixed. Yavelak also said he made requests related to the HVAC not working, and on several occasions someone came out to address the HVAC. During one of the times a maintenance worker was there to address the HVAC, Yavelak said the worker told him there had been an issue

---

[2] Ledbetter said an air conditioning vendor removed the unit and put it back in, but the vendor was not hired to do any mold remediation.

[3] The IICRC S520 guidelines were apparently admitted at trial, but that exhibit was not included in the record on appeal.

with a coil in the HVAC and the "entire unit flooded before [Yavelak] moved in and we did a remediation" (this conversation was sometime between March 25 and April 3, 2018), which was the first time Yavelak learned the unit had flooded before he moved in.

Yavelak testified he saw "some green fuzzy mold on the quarter round of the baseboard" in front of the kitchen sink around the third week of April 2018.[4] Yavelak said he used a paper towel to wipe up the mold, and it did not cross his mind the mold could have been coming from behind the walls. He did not inform Antivo at this time of seeing the mold.

Yavelak testified a person from Antivo's maintenance staff changed the air filter in the HVAC unit on May 3, 2018. Yavelak said he was present and the person who changed the filter did not say anything about seeing water damage or mold.

Yavelak testified there was a drip from a recessed light in his kitchen ceiling, and someone from the maintenance staff told him on June 4, 2018, there was a leak in the sink in the above apartment that caused the drip and he had stopped the leak.

Yavelak testified he was on a work trip from June 8 to June 13, 2018,[5] and when he returned, he found mold in the same spot in the kitchen but it was "more aggressive." He said he pulled the bottom drawer of the

---

[4] On cross-examination, Yavelak said this occurred on June 5th when questioned about what he had noted in an email dated June 13th. However, Yavelak subsequently testified he thought about it further and he saw the mold in April, indicating he must have misstated the date in the email.

[5] Yavelak's friend stayed in the apartment while Yavelak was out of town.

kitchen cabinet out and saw the back of the wall had mold on it, and he also found mold in the HVAC closet.[6] He said the mold growth was "bottom-up." Yavelak stated he did not see any evidence the ceiling above his HVAC unit was leaking. He also said he noticed a smell in the apartment and it "was very stale." Yavelak noted he sent an email to resident services regarding the mold that night, and the next day he made sure resident services knew and someone came to inspect. On June 14, 2018, Yavelak moved to a different furnished apartment at Antivo, which he resided in until he moved to Arizona around December 31, 2018.

Yavelak testified he experienced health issues that began around the first week of April and started with headaches, a more aggressive cough, irritation and sensitivity, joint pain, and weight gain. Yavelak said his health was deteriorating once he moved into the other furnished apartment, and his cough got worse and he would lose his train of thought. Yavelak stated he eventually went on medical leave on October 22. He said when he exhausted medical leave in January he was not able to return to work and his working relationship with his former employer ended.

Ledbetter created a new statement of work in June 2018 regarding remediation in the apartment. Ledbetter testified he determined the moisture intrusion came from the HVAC unit in the apartment above (although he said he never went into the apartment above), and because Yavelak was going to involve a lawyer, he hired an outside vendor to perform the remediation. A different outside vendor was also hired to do the clearance and air sampling.

---

[6] One of the areas Yavelak found mold was where the maintenance worker had changed the air filter on May 3.

Joseph Gutierrez, who was hired by Yavelak, testified he is an ACAC Council-Certified Structural mold investigator and a mycotoxin assessor for RealTime Laboratories. He visited the apartment four times between June 16 and July 2, 2018.[7] Joseph testified it was more likely than not the mold in the property was producing mycotoxins.[8] Joseph noted a sample collected on July 2, 2018, found Aspergillus/Penicillium and Chaetomium; Aspergillus/Penicillium and Chaetomium are known to produce mycotoxins (Aspergillus/Penicillium were also found in a sample collected on June 16, 2018). Joseph stated he did a test for mycotoxins on June 18, 2018, which was negative. However, Joseph stated mold testing is a snapshot in time and there can be a false negative if a mold that is known to produce mycotoxins was not producing mycotoxins at the time of testing.

Joseph testified he did not see any evidence above the HVAC unit that water was coming from the upstairs unit, and in his opinion, the water source was directly from the HVAC system in Yavelak's apartment. Joseph also explained a picture of a window in the living room with streaking showed the window was starting to fail, "[m]eaning that there is moisture seepage and fogging accumulating within the dual-pane system" and he

---

[7] As another witness at trial shares the same last name as Joseph Gutierrez, this opinion refers to Joseph by his first name; no disrespect is intended.

[8] Antivo's expert Dr. Andrew Saxon testified mycotoxins are secondary products from mold or fungi, meaning they are "something the organism doesn't make all the time" and they are "things that mold and fungi make during their lifecycle when they're threatened. And when they're threatened, they strike out into their environment. They can fight bacteria for space." He said some of them "are quite toxic." He added mycotoxins are everywhere, including in food.

thought it appeared "there was mold that was growing within the dual pane."[9]

Mark Levy testified he has done over 5,000 individual mold inspections. Levy stated the IICRC S520 guidelines are the standard for professional mold remediation. Levy opined there were many problems with the remediation that occurred in January 2018. Levy said one issue was there was no evidence the HVAC system was cleaned, and "in the IICRC S520, any time you have remediation that's performed, it is required for the HVAC system to be properly cleaned." Levy stated the visual inspection was insufficient because spores and fragments can be microscopic, and no air or surface sampling was done. He also noted the IICRC S520 indicates it is a conflict to have the same team do the remediation and the assessment. Levy opined there were a lot of residual issues from the January 2018 remediation. He said the Irvine Company's remediation team bypassed industry guidelines and did not follow proper procedures.

Levy further opined the source of the mold found in June 2018 was not a leak in the above apartment, and the moisture issue that led to the mold growth was there prior to Yavelak moving in.[10] Levy explained the density of the mold growth indicated it had been there for some time which "showed that it was there prior to the water leak that was above." Additionally, when the ceiling drywall was removed in the HVAC closet and adjacent to it, the ceiling was wet but there was no mold. He also said there

---

[9] On cross-examination, Joseph testified he did not test to confirm there was actually mold in the window (which would have required damaging the window) but it was his suspicion there was mold.

[10] Levy also stated it was "certainly feasible" water came from above.

was no evidence of any type of HVAC system cleaning when it was taken out, and his opinion is supported by the streaking in the windows, which indicated there were water vapors "being distributed throughout the entire home."

Dr. Robin Bernhoft testified he has practiced environmental medicine for about 16 years and first saw Yavelak for treatment in September 2018. Bernhoft ordered an at-home urine test for Yavelak, which resulted in the Great Plains Laboratory report.[11] The Great Plains Laboratory report showed Yavelak was negative for various mycotoxins but he was positive for a mycotoxin called Ochratoxin A. Bernhoft said Yavelak's level of Ochratoxin A was well above the average exposure level. Bernhoft testified Ochratoxin A is produced by Aspergillus and Penicillium. Bernhoft concluded mold from Yavelak's apartment caused his symptoms.[12] Bernhoft

---

[11] Yavelak testified he collected the urine sample on or before September 26, 2018, and sent it by FedEx. The Great Plains Laboratory report noted the date of collection as September 27, 2018, and Yavelak said he did not know what the date of collection on the report refers to and whether it meant that was the date received at the lab.

[12] Bernhoft noted "[p]eople always ask, . . . 'Did you do a differential diagnosis?' [¶] You know, if he were independently wealthy and we had time and money, we could have done, you know, MRI[s] for his headaches and sent him to a weight clinic, but that's not how medicine is practiced or at least it shouldn't be. [¶] The adverse [e]ffect of exposure to mold with these symptoms is a diagnosis in itself. There's nothing else to cover."

A differential diagnosis "is a standard method doctors use to eliminate potential causes of illness to be able to reach a diagnosis." (*Brancati v. Cachuma Village, LLC* (2023) 96 Cal.App.5th 499, 506 (*Brancati*).) "This process does not require doctors to eliminate all hypothetical causes before making a diagnosis." (*Ibid.*)

opined it was more likely than not Yavelak's apartment was responsible for the mycotoxin in Yavelak's urine and symptoms. Bernhoft testified there was no other explanation more likely to explain the presence of Ochratoxin A in Yavelak's system than the exposure at his apartment.[13]

Bernhoft also testified, although Yavelak being in the apartment for three months was "a little quick" to have that level of Ochratoxin A, Yavelak was more vulnerable than most people because of his genetics. When asked about the fact the Ochratoxin A was found in Yavelak's urine several months after moving out of the apartment, Bernhoft explained it takes a long time for Ochratoxin A to leave someone's system, and "[i]t usually takes a year-and-a-half, two years to clean people out."

Additionally, the Great Plains Laboratory report noted "[e]xposure is primarily through contaminated foods such as cereals, grape juices, dairy, spices, wine, dried vine fruit, and coffee[,]" but "[e]xposure to [Ochratoxin A] can also come from inhalation exposure in water-damaged buildings." When asked if he took into consideration whether Yavelak's Ochratoxin A level could be a diet issue, Bernhoft stated Yavelak "doesn't eat moldy corn" and, according to peer-reviewed articles, "ingestion is a very minimal problem" in North America. Bernhoft further explained the state of the literature is, unless someone is in a country where moldy food is regularly being consumed, inhalation is the primary vehicle for exposure.

Dr. Andrew Saxon testified there were a number of problems with the Great Plains Laboratory test, including that the technique was not validated, and he found the testing "useless on many levels." He criticized

---

[13] Bernhoft also testified regarding Yavelak's treatment plan and costs.

9

Bernhoft for not doing a differential diagnosis and the treatments as "fringe care." He also said there was no physical reason Yavelak could not work from October 2018 to December 2021.

The jury found Antivo was negligent and its negligence was a substantial factor in causing harm to Yavelak, and it also found Antivo breached the implied warranty of habitability and Yavelak was harmed by Antivo's breach of the implied warranty of habitability.[14] The jury awarded Yavelak $423,036.90, which consisted of $35,713 for past medical expenses, $0 for future medical expenses, $137,323.90 for other economic damages, $250,000 for past noneconomic damages, and $0 for future noneconomic damages. Antivo moved for a new trial and judgment notwithstanding the verdict, but the trial court denied both motions. Antivo appeals from the judgment and denial of its motion for judgment notwithstanding the verdict.[15]

---

[14] The jury found against Yavelak on the other claims: regarding breach of implied covenant of good faith and fair dealing, the jury found Antivo did not unfairly interfere with Yavelak's right to receive the benefits of the lease; regarding private nuisance, the jury found the condition did not substantially interfere with Yavelak's use or enjoyment of the property; regarding negligent misrepresentation, the jury found Antivo did not make a false representation of fact, or facts, to Yavelak; and regarding constructive eviction, the jury found Yavelak was not harmed by Antivo's wrongful interference with Yavelak's right to use of or enjoyment from the property.

[15] The denial of Antivo's motion for a new trial "is not itself appealable; rather, the new trial denial is reviewable on appeal from the underlying judgment." (*Quantum Cooking Concepts, Inc. v. LV Associates, Inc.* (2011) 197 Cal.App.4th 927, 930, fn. 4.)

## DISCUSSION

### I.

### THE GREAT PLAINS LABORATORY REPORT

Antivo argues the trial court erred in admitting the Great Plains Laboratory report. However, we find Antivo waived this argument.

*A. Background*

Prior to trial, Antivo filed its motion in limine No. 2, which sought to exclude the Great Plains Laboratory report and preclude any witness testimony based on the report. Antivo's motion asserted "(1) mycotoxin urinalysis is not generally accepted by recognized authorities in the scientific field; (2) [Yavelak] has failed to designate an expert witness under Code of Civil Procedure section 2034 et seq. who can testify as to the methods used to analyze the samples; (3) [Yavelak] cannot establish that the correct scientific procedures were used in administering the mycotoxin urinalysis; and (4) there is no chain of custody demonstrating that this report reflect [*sic*] the analysis of samples taken from [Yavelak's] urine." (Italics omitted.) In opposition, Yavelak stated, inter alia, he "may call William Shaw, PhD, the laboratory director at Great Plains Laboratory, as a witness at trial should further elucidation of the mycotoxin tests be required."[16]

At a pretrial hearing regarding motions in limine, the trial court noted its rulings "are all without prejudice and [it] could change its mind during the trial." Relevant here, the trial court denied Antivo's motion in limine No. 2. The trial court noted, inter alia, it presumed Yavelak would give testimony "he mailed it to the lab and received it directly back from the lab" and "any notion that somehow the chain of custody was broken really goes to

---

[16] Shaw did not testify at trial.

11

the weight of it and not the admissibility." The trial court added it had "looked at a number of cases, and they seem to allow people to send off samples to a lab and get them back" and "as long as there's an adequate foundation for it, it appears to be that they allow the business records exception, as long as all the criteria are met for that under the evidence code, especially done by declaration. The declaration has to check all the boxes or it doesn't come in."

At trial, Yavelak's counsel sought to admit the Great Plains Laboratory report during Bernhoft's direct testimony. Antivo's counsel objected and stated "[i]f we could reserve, I want to cross-examine on the foundation. It also involves hearsay." After Yavelak's counsel asserted there was a stipulation to foundation, Antivo's counsel said there was not, and there was "a stipulation as to authenticity, not as to admissibility." Antivo's counsel said he will "admit that it's authentic, but [he] still [has] foundation and hearsay concerns [he would] like to explore on [c]ross." The trial court then sustained the objection, and further questioning continued of Bernhoft.

The next day, while Bernhoft was still on direct testimony, Yavelak's counsel again asked to admit the Great Plains Laboratory report. When the trial court asked if there was any objection, Antivo's counsel responded "[n]o objection[,]" and the report was admitted.

B. *Antivo Waived Its Argument*

"The failure to object or move to strike evidence at trial forfeits any challenge to the evidence on appeal." (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1020 (*Crouch*); see also Evid. Code, § 353, subd. (a).) Although Antivo initially objected at trial to the admission of the Great Plains Laboratory report and the trial court sustained

12

the objection, Antivo's counsel said the next day it had no objection to the report's admission. Antivo thus waived its arguments as to admissibility.

Antivo contends it preserved its objection because of its motion in limine. Antivo asserts, "[g]iven the specificity of the motion in limine, Antivo did not object at trial when the Great Plains Laboratory report was admitted into evidence." (Italics omitted.) According to Antivo, when the trial court "turned to Antivo's counsel regarding the urine test results, counsel either had to (1) repeat an objection that had already been overruled, thus risking drawing the ire of the court or even a 'misconduct' allegation if it started referencing the denied motion in limine in the presence of the jury, or (2) do precisely what it did—since it knew it had lost the issue, but preserved it through its motion in limine, it stated 'no objection' so that the trial could proceed without unwarranted interruption." (Italics omitted.) Antivo's briefing does not mention the fact it initially objected at trial and the trial court sustained the objection, before Antivo's counsel later stated it had no objection.

"A motion in limine to exclude evidence is sufficient to preserve an objection if the motion (1) is directed to a particular, identifiable body of evidence; (2) states a specific legal ground for exclusion that is subsequently raised on appeal; and (3) is made at a time before or during trial when the trial court can determine the evidentiary issue in its appropriate context. [Citation.] 'When such a motion is made and denied, the issue is preserved for appeal.'" (*Crouch, supra,* 39 Cal.App.5th at p. 1021.) As the California Supreme Court has explained, "[e]vents in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353."

13

(*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

Here, Antivo's motion in limine did not preserve its objection given the context of the trial proceedings. During the motion in limine hearing, the trial court noted its rulings were without prejudice and implied admissibility of the report would ultimately depend on the evidence, noting cases appear to allow people to send and receive lab samples "as long as there's an adequate foundation for it" and "as long as all the criteria are met for" the business records exception. The trial court also stated a "declaration has to check all the boxes or it doesn't come in." Moreover, Antivo initially objected at trial indicating it wanted to explore foundation and hearsay concerns on cross-examination and the trial court sustained the objection. Then the next day, when Yavelak's counsel again sought to admit the report, Antivo stated it had no objection to the report's admission. Under these circumstances, if Antivo believed the Great Plains Laboratory report was inadmissible and the evidence at trial was insufficient to establish admissibility, it was incumbent on Antivo to maintain its objection to preserve its arguments.

## II.

### BREACH AND CAUSATION

Antivo contends there was no substantial evidence supporting breach of a legal duty or causation. We disagree.

*A. Standard of Review*

"When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citation.] ""[T]he power of [the] appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or

14

uncontradicted which will support the [verdict]." [Citations.]' [Citation.] We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.] Needless to say, a party 'raising a claim of insufficiency of the evidence assumes a "daunting burden."'" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) Given Antivo challenges the sufficiency of the evidence, the substantial evidence standard of review also applies to Antivo's challenge to the denial of its motion for judgment notwithstanding the verdict. (See *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

*B. Legal Principles*

"The elements of a cause of action for negligence are: the 'defendant had a duty to use due care, that he [or she] breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'" (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 278.) The elements of a claim for breach of the implied warranty of habitability "are the existence of a material defective condition affecting the premises' habitability, notice to the landlord of the condition within a reasonable time after the tenant's discovery of the condition, the landlord was given a reasonable time to correct the deficiency, and resulting damages." (*Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1297.)

Additionally, as the California Supreme Court has noted, the implied warranty of habitability "gives a tenant a reasonable expectation that the landlord has inspected the rental dwelling and corrected any defects disclosed by that inspection that would render the dwelling uninhabitable. The tenant further reasonably can expect that the landlord will maintain the property in a habitable condition by repairing promptly any conditions, of

15

which the landlord has actual or constructive notice, that arise during the tenancy and render the dwelling uninhabitable. A tenant injured by a defect in the premises, therefore, may bring a negligence action if the landlord breached its duty to exercise reasonable care. But a tenant cannot reasonably expect that the landlord will have eliminated defects in a rented dwelling of which the landlord was unaware and which would not have been disclosed by a reasonable inspection. The implied warranty of habitability, therefore, does not support an action for strict liability." (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1205–1206, footnotes omitted; see also *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1605–1606 [noting a landlord is subject to liability for matters that would have been disclosed by a reasonable inspection at the time of leasing].)

"In determining evidence of causation, the court applies a substantial factor standard. "'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.""" (*Brancati, supra,* 96 Cal.App.5th at p. 504.) "[I]n a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case." (*Jones v. Ortho Pharmaceutical* (1985) 163 Cal.App.3d 396, 402.)

C. *Substantial Evidence Supports Breach*

Antivo argues the "[t]he undisputed facts demonstrate Yavelak's habitability and negligence theories were based on pure conjecture and mere 'possibilities,' which are insufficient to establish liability." According to Antivo, there was no substantial evidence "(1) the January 2018 leak and remediation in fact left behind mold, moisture, or contaminated material, or (2) Antivo knew or reasonably should have known the [apartment's] HVAC

16

closet and wall space behind the kitchen cabinets harbored mold spores that would not be visible through a reasonable inspection." Antivo asserts "there was no evidence of mold in the [apartment] for *months* after the HVAC system was reinstalled, nor in May 2018, when the air filter was replaced. Moreover, the only evidence of the source of the mold reported in June 2018 was the HVAC system in the *upstairs* unit."

Viewing the evidence in the light most favorable to Yavelak, we conclude there was substantial evidence supporting breach for the negligence and implied warranty of habitability claims. Antivo knew there was a leak in January 2018, but Levy testified Antivo's remediation in January 2018 bypassed industry guidelines and did not follow proper procedures, which included not properly cleaning the HVAC system and only conducting a visual inspection. Moreover, around the time Yavelak moved in, he raised with Antivo that there was streaking residue in the windows, which Antivo did not fix. Levy testified this streaking demonstrated the distribution of water vapors throughout the apartment, and Joseph testified he thought it appeared there was mold growing within the dual pane. Yavelak also found a small amount of mold in his kitchen in April in the same place mold would appear more aggressively in June. Finally, Levy and Joseph testified they did not believe the source of the moisture that led to the mold growth in June 2018 was from the apartment upstairs. Thus, there was substantial evidence Antivo acted unreasonably in its January 2018 remediation that did not

eliminate the contamination,[17] and a reasonable inspection would have discovered the issues.[18]

Antivo raises contrary evidence—e.g., moisture being found in the ceiling and the timing of when mold was found compared to how long it typically takes to grow. However, given the standard of review, it is not this court's role to "reweigh the evidence or judge the credibility of witnesses." (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251.)

## D. Substantial Evidence Supports Causation

Antivo contends, even if the Great Plains Laboratory report was properly admitted, there was no substantial evidence of causation. According to Antivo, "the presence of mold, in itself, does not establish the presence of mycotoxins, much less an exposure to them." (Capitalizations omitted.) Antivo points to Joseph's test from June 18, 2018, which found no mycotoxins at the apartment, and asserts there was no evidentiary basis for concluding Yavelak's mycotoxin exposure occurred at the apartment.

---

[17] Antivo asserts "the jury effectively found the mold observed in June 2018 was not a continuation of the January 2018 event" by finding against Yavelak's negligent misrepresentation claim. Antivo points to testimony a worker told Yavelak "we did a remediation" on the property from a flood, but this statement was made to Yavelak after he moved in. Antivo does not explain why this was the statement that was the supposed basis of the negligent misrepresentation claim, nor has Antivo argued on appeal, with citation to applicable legal authority, that a new trial should have been ordered because this purported conclusion by the jury regarding the negligent misrepresentation claim was an inconsistent verdict.

[18] Antivo contends the verdict against it effectively imposed strict liability. That is not the case, as demonstrated by the above discussion.

Antivo's argument is unavailing. Substantial evidence supports finding Yavelak was exposed to mycotoxins at the apartment. Evidence showed Aspergillus/Penicillium were found at the apartment and can produce the mycotoxin Ochratoxin A, which is what was found in Yavelak's urine. Bernhoft also opined it was more likely than not Yavelak's apartment was responsible for the mycotoxin in Yavelak's urine and symptoms. The single sample in the apartment from June 18, 2018, found no mycotoxins, but Joseph explained negative results can occur if the mold is not producing mycotoxins at that time. Although the negative mycotoxin test may weigh against finding mycotoxin exposure at the apartment, it does not foreclose such a finding given the other evidence here and we do not reweigh the evidence.

Antivo cites *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298 (*Geffcken*) and *Dee v. PCS Property Management, Inc.* (2009) 174 Cal.App.4th 390 (*Dee*), but neither of those cases support Antivo's position. In *Geffcken*, the plaintiffs alleged they were injured by exposure to mycotoxins and intended to present expert testimony that exposure to mycotoxins caused their injuries. (*Geffcken, supra,* at pp. 1301–1302.) That expert relied in part on a test purportedly showing antibodies produced by exposure to mycotoxins and a blood serology test purportedly showing antibodies produced by exposure to mold. (*Id.* at pp. 1303–1304.) The trial court granted motions in limine to exclude the two tests and the expert testimony, as well as environmental sampling data showing the presence of mold. (*Id.* at pp. 1303, 1305–1306.) The appellate court affirmed, concluding with respect to the two tests, the plaintiffs had failed to show these tests had gained general acceptance in the relevant scientific community. (*Id.* at pp. 1309–1310.) The appellate court also concluded, "[i]n view of the absence of any reliable

19

evidence that [the plaintiffs] had been exposed to mycotoxins at the properties in question, [the expert's] opinions were speculative and conjectural." (*Id.* at p. 1311.)

In *Dee*, the trial court similarly excluded blood tests, including a "test to analyze mycotoxin antibodies and an interleukin-2 test allegedly reflecting mycotoxicosis[,]" and on appeal, the plaintiff did not challenge this exclusion. (*Dee, supra,* 174 Cal.App.4th at pp. 394–395.) However, the plaintiff did challenge on appeal the trial court's exclusion of certain expert testimony on causation. (*Id.* at pp. 395–398.) Citing *Geffcken*, the appellate court in *Dee* found the trial court did not abuse its discretion in excluding the expert testimony. (*Dee, supra,* at p. 405.) The appellate court explained there was no evidence the plaintiff was exposed to mycotoxins, and "[a]lthough a minute amount of [a mycotoxin] was found weeks after Dee moved out of her apartment, nothing in the record supports a causal connection between a minute amount of [a mycotoxin] and any illness." (*Ibid.*)

Both *Geffcken* and *Dee* are distinguishable from the circumstances here. Unlike those cases, the test showing the presence of mycotoxin in Yavelak's urine was admitted.

Antivo also contends causation is undermined by Bernhoft's failure to perform a differential diagnosis. Antivo cites *Brancati*, which noted "[t]here are two methods used to prove mold is the cause of an illness": (1) "[a]n expert may testify using a 'methodology generally [recognized] in the scientific community' to determine mold as the cause [citation] and may rely on epidemiological studies to show a statistical link between exposure to the substance and the cause of the illness"; or (2) "a doctor who examines a patient may use a medical 'differential diagnosis' to determine mold as the cause of the diagnosed illness." (*Brancati, supra,* 96 Cal.App.5th at p. 505.) In

20

*Brancati*, the appellate court reversed the exclusion of expert testimony that mold in the plaintiff's home caused the plaintiff's illness where the expert in part relied on a differential diagnosis. (*Id.* at pp. 502–503, 506–509.)

Here, the record does not reflect Antivo objected at trial to Bernhoft's testimony on the basis he purportedly failed to perform a differential diagnosis, and thus, Antivo has forfeited a challenge to the admissibility of Bernhoft's testimony based on his methodology. (See *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563–565 [concluding party forfeited challenge that expert used an improper methodology].) Notably, Antivo does not dispute it did not object at trial to Bernhoft's testimony on this ground. Instead, relying on *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 739 (*Atkins*), Antivo argues "[n]o objection is required to assert on appeal that trial evidence— including an expert's opinion—'had no evidentiary support.'"

In *Atkins*, the plaintiffs were former recruit police officers who were terminated or constructively discharged from the police academy. (*Atkins, supra,* 8 Cal.App.5th at p. 704.) The jury awarded the plaintiffs damages, which included future lost earnings. (*Id.* at pp. 714, 737.) The plaintiffs' expert "calculated the present value of what each plaintiff would have earned had they worked as police officers (or in the case of [one plaintiff], as a management analyst) for 25 to 33 years, earning promotions along the way, and then received retirement income and benefits" and subtracted as mitigation the plaintiffs' expected earnings from other jobs. (*Id.* at pp. 736–737.) On appeal, the court recognized the defendant had forfeited the ability to appeal the admissibility of the expert's testimony but it was not precluded "from arguing [the expert's] opinion had no evidentiary support." (*Id.* at pp. 739–740 [noting "[c]ompetent evidence is not necessarily

21

substantial evidence"].) The court noted, "[i]f the expert's opinion is not based on facts otherwise proved or if the opinion assumes facts contrary to the evidence, 'it cannot rise to the dignity of substantial evidence.'" (*Id.* at p. 740.) The court found "[t]he plaintiffs' expert 'simply assumed' the plaintiffs would have completed their [a]cademy training and probationary period and remained police officers for over 25 years, without any evidence of the likelihood that the plaintiffs would successfully run the table from the [a]cademy to retirement." (*Id.* at p. 742.) It further explained "there were no facts on which to build [the expert's] opinion that the plaintiffs were entitled to recover future economic damages to retirement. Even giving deference to the trial court's ruling denying the [defendant's] motion for a new trial and drawing all inferences in favor of it, the evidence is too speculative to lend support to the award of the plaintiffs' future lost earnings until retirement." (*Ibid.*) The court ultimately reversed the award of future economic damages and remanded for a new trial. (*Id.* at p. 743.)

*Atkins* is inapposite. Viewing the evidence in the light most favorable to Yavelak, Bernhoft's testimony did not simply assume facts, was not based on speculation, and was not purely conclusory. As discussed, *ante*, there was evidence supporting Yavelak's exposure to mycotoxins at the apartment, including the type of mold found at the apartment and the Great Plains Laboratory report. Bernhoft, who has treated about 350 patients regarding exposure to mold or wet buildings, testified he had an initial examination with Yavelak that lasted about 80 minutes, during which Bernhoft conducted a physical examination and spent a significant amount of time taking a comprehensive history, including discussing symptoms and past medical history. Bernhoft also reviewed the environmental studies of the apartment and ultimately concluded it was more likely than not Yavelak's

22

apartment was responsible for the mycotoxin in Yavelak's urine and symptoms. Bernhoft also testified there was no other explanation more likely to explain the Ochratoxin A in Yavelak's system than the exposure from his apartment. Regarding possible mycotoxin exposure in food, Bernhoft explained, according to peer-reviewed articles, "ingestion is a very minimal problem" in North America. Moreover, there was no evidence in the record that Yavelak actually visited some other location with high levels of Ochratoxin A. Viewing the evidence in the light most favorable to Yavelak, Bernhoft's testimony was substantial evidence the mold in the apartment was the cause of Yavalek's injuries under the circumstances here.

## DISPOSITION

The judgment and order denying the motion for judgment notwithstanding the verdict are affirmed. Respondent shall recover its costs on appeal.


MOTOIKE, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


GOODING, J.

23